OPINION OF THE COURT
Chief Judge Breitel.
In an action on an alleged oral agreement to pay plaintiff a 5% fee for his participation in the obtaining by defendant of a $41 million construction contract, defendant moves under CPLR 3212 for summary judgment based on the Statute of Frauds (General Obligations Law, § 5-701, subds 1, 10). Plaintiff’s claim arises out of his asserted role, varyingly described, in procuring for defendant a contract to build a chemical plant in Saudi Arabia. Supreme Court denied the motion; a unanimous Appellate Division reversed; and plaintiff appeals.
There are two issues. The first is whether a motion for summary judgment based on the New York Statute of Frauds may be defeated by plaintiff’s general averment, without more, that the parties agreed to be governed by the law of Saudi Arabia. Assuming, however, that no such agreement is properly asserted, and that New York law applies, the second *263 issue is whether the fee agreement for obtaining the construction contract is within the Statute of Frauds (General Obligations Law, § 5-701). In particular, at issue is whether, within the meaning of subdivision 1 of the cited statute, the agreement "[b]y its terms [was] not to be performed within one year”, and, whether within the meaning of subdivision 10, relating to business brokers and finders, plaintiff’s alleged activities as an intermediary amounted to negotiation of a "business opportunity”.
The order of the Appellate Division should be affirmed, and the complaint stand dismissed. Having failed to present any evidentiary facts that the parties manifested an intention that Saudi law would govern, plaintiff raises no triable issue of fact. Applying the New York Statute of Frauds, the suit is barred (General Obligations Law, § 5-701). Subdivision 1 of the statute does not bar the claim because the alleged agreement was "By its terms”, even if not as a practical matter, performable within a year. Since, however, arranging, directly or indirectly, for defendant to negotiate with Saudi officials and to effect the Saudi contract is "negotiating * * * a business opportunity” within the meaning of subdivision 10, the claim is barred.
Some time in 1961 plaintiff, Benjamin H. Freedman, met in New York City with David Fulton, an officer of defendant Chemical Construction Corporation. Both Freedman and the corporation do business in New York. Freedman, a self-described retired industrialist, allegedly arranged the meeting to interest Chemical in constructing in Saudi Arabia a plant that would convert flared off natural gas into fertilizer. According to Freedman, after a series of meetings with Fulton in New York, Freedman and his Syrian associate, Issa Nakhleh, negotiated with Saudi officials at Chemical’s request. Freedman contends that as a result of these negotiations Chemical was removed from the Arab blacklist and, in December, 1966, awarded the sought-after contract. The plant is said to have been completed in 1970. Intraoffice memoranda prepared by Fulton and correspondence between Chemical and Saudi officials included in the record supply at least some evidence of the alleged events.
At the heart of the case is Freedman’s assertion, denied by Chemical, that upon completion of the proposed plant he was to be paid a 5% fee, or $2.05 million, for his services. No one *264 disputes that there was no writing of any kind to evidence the agreement.
Precisely what Freedman did on Chemical’s behalf, other than approaching Chemical and interesting Nakhleh in the endeavor, is unclear. Freedman admitted in his examination before trial that he did not visit Saudi Arabia until 1973, at which point the plant was already operating. Although there is a general statement in his opposing affidavit that he had written letters to Saudi Arabian officials, and that he had forwarded Chemical’s proposal to a member of the Saudi royal family, his testimony at the examination before trial is contradictory.. The complaint supplies no additional information. Any negotiating in Saudi Arabia was apparently done by Nakhleh, a Syrian lawyer who traveled in the Middle East.
This action followed Chemical’s refusal to honor the claimed fee agreement. Chemical, raising the Statute of Frauds, moved for summary judgment. Freedman, seeking to avoid the statutory bar, alleges that the purported oral agreement included an understanding that Saudi law would apply. Saudi law, presumably, has no equivalent writing requirement.
It is elementary that conclusory assertions will not defeat summary judgment. The opponent of a properly made summary judgment motion must present evidentiary facts sufficient to raise a triable issue of fact (e.g., Shaw v Time-Life Records, 38 NY2d 201, 207; Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 290; 4 Weinstein-KornMiller, NY Civ Prac, par 3212.12, p 32-173).
Supported by nothing in Freedman’s affidavit in opposition to summary judgment, or in his examination before trial, the contention that the parties had intended, let alone agreed, that Saudi law would govern does not create a triable issue. The one vague reference to Saudi law in Freedman’s examination before trial related only to a purported agreement between Nakhleh and Chemical, an agreement with which Freedman, again in the examination before trial, emphatically disavowed any "connection”. For the same reason, it is of little persuasive value that in a separate action for another 5% fee brought by Nakhleh in Federal court a triable issue was held to exist (Nakhleh v Chemical Constr. Corp., 359 F Supp 357, 359). Summary judgment is thus a proper remedy, *265 assuming, of course, that the New York Statute of Frauds applies.*
Turning, then, to section 5-701 of the General Obligations Law, the relevant Statute of Frauds, Chemical relies on subdivisions 1 and 10 to bar the claim.
Subdivision 1 renders unenforceable an oral agreement which "[b]y its terms is not to be performed within one year from the making thereof’. True, as Chemical asserts, it was unlikely that Freedman’s efforts to obtain the construction contract and Chemical’s payment, due only upon completion of the plant, would occur within one year. In fact, Freedman admits it took over three years for his own performance and another six until the plant was built. It matters not, however, that it was unlikely or improbable that a $41 million plant would be constructed within one year. The critical test, instead, is whether "by its terms” the agreement is not to be performed within a year. (North Shore Bottling Co. v Schmidt & Sons, 22 NY2d 171, 175-176; Nat Nal Serv. Stas, v Wolf, 304 NY 332, 335.) Since neither party has contended that the alleged agreement contained any provision which directly or indirectly regulated the time for performance, the agreement is not within the bar of subdivision 1.
A writing is also required, under subdivision 10 of the statute, if the agreement "[i]s a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. *266 'Negotiating’ includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman.” The statute, which has had its difficulties in interpretation, applies to various kinds of intermediaries who perform limited services in the consummation of certain kinds of commercial transactions. The historical controversy whether it applied to finders as distinguished from brokers is settled to include both (Intercontinental Planning v Daystrom, Inc., 24 NY2d 372, 378; Minichiello v Royal Business Funds Corp., 18 NY2d 521, 524-527, cert den 389 US 820). Freedman does not argue otherwise. What he does contend, however, is that the kind of services he rendered under the agreement did not amount to negotiation of a "business opportunity”. In effect, he would sharply limit the scope of the term "business opportunity” and exclude enterprises which were hardly intended to be excluded.
Until 1949, there was no requirement that agreements with business brokers be in writing. To protect principals from "unfounded and multiple claims for commissions”, and in response to the substantial number of cases involving sales of businesses and business opportunities, the predecessor to subdivision 10 of section 5-701 was enacted (L 1949, ch 203; 1949 Report of NY Law Rev Comm, p 615).
Since enactment of the statute, however, the scope of the term "business opportunity” has been differentially applied (see, e.g., Lounsbury v Bethlehem Steel Corp., 53 Misc 2d 151, 152-156 [does not include contract to sell floating dry dock]; National Performing Arts v Guettel, 46 Misc 2d 411, 413-414 [includes contract to sell or lease packaged productions to theatre owners]; Sorge v Nott, 22 AD2d 768, revg 34 Misc 2d 545 [includes contract to procure purchaser of working interest in oil wells]; 1964 Report of NY Law Rev Comm, p 178, n 26). The scope is still to be fully resolved.
Too broad an interpretation would extend the writing requirement to unintended situations. For instance, the typical stockbroker’s dealings might be covered. (See Lounsbury v Bethlehem Steel Corp., supra, p 153; see, generally, 1949 Report of NY Law Rev Comm, pp 634-636.)
*267 Too restrictive an interpretation would defeat the purpose of the legislation. Because in some circumstances the important services of an intermediary may be accomplished in the course of a few and even momentary conversations, false or exaggerated claims can be asserted easily and disproved only with difficulty. It is this type of situation to which the statute is addressed. (See Minichiello v Royal Business Funds Corp., 18 NY2d 521, 527, supra.) Most important, too restrictive an interpretation would ignore the many situations which in common parlance are described as "business opportunities.”
For this case it is not necessary nor would it be proper to attempt to resolve the ultimate scope of the term "business opportunity”. Freedman’s purported role was, concededly, limited and transitory. He was not involved, nor was he supposed to be, in negotiation of the construction contract terms. He was to use his "connections”, his "ability”, and his "knowl-* edge” to arrange for Chemical to meet "appropriate persons” and somehow to procure for it the opportunity to build the multimillion dollar plant. Yet, as observed earlier, it is just this kind of situation to which the statute is addressed.
The term, as used in the statute, may not cover every situation which in common parlance might be called a "business opportunity”. But where, as in the instant case, the intermediary’s activity is so evidently that of providing "know-how” or "know-who”, in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in an enterprise, the statute is entitled to be read both in accordance with its plain meaning, its evident purpose, and to accomplish the prevention of the mischief for which it was designed.
The alleged agreement, therefore, was for services rendered in negotiating a "business opportunity”, and, in the absence of a writing, so easily obtained in a proper case, is unenforceable. Defendant is entitled to summary judgment.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the complaint stand dismissed.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed, with costs.

 One caveat, however, is in order. Even if the parties had agreed that Saudi law would govern the purported oral agreement, that the New York Statute of Frauds is thereby avoided does not necessarily follow. As a general matter, the parties’ manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored (see, e.g., Companía de Inversiones Internacionales v Industrial Mtge. Bank of Finland, 269 NY 22, 26; Restatement, Conflict of Laws 2d, § 187). It is as though the law of the selected jurisdiction were incorporated into the agreement by reference (see Restatement, Conflict of Laws 2d, § 187, Comment c). But where, as with the Statute of Frauds, the issue arguably cannot be controlled by voluntary agreement, there is some question whether, in the absence of a reasonable basis for choosing the law of the jurisdiction designated by the parties, their choice of law will be honored (see Restatement, Conflict of Laws 2d, § 187, subd [2], par [a]; Comment f; cf. A. S. Rampell, Inc. v Hyster Co., 3 NY2d 369, 382-383; Nakhleh v Chemical Constr. Corp., 359 F Supp 357, 359-360, supra; see, generally, Statute of Frauds and Conflicts of Law, Ann., 47 ALR3d 137).