■ LADENBURG THALMANN & CO., INC., Appellant, v TIM'S AMUSEMENTS, INC., et al., Respondents. [712 NYS2d 526] —Orders, Supreme Court, New York County (Ira Gammerman, J.), entered on or about March 9, 1999, which, to the extent appealed from, dismissed the first and third causes of action in the complaint, unanimously reversed, with costs, the causes of action reinstated and plaintiff granted leave to amend the complaint to plead a cause of action based upon an agreement to pay a finder's fee for the Winstuff acquisition.

The complaint alleges that in December 1995 Tim's Amusements (Tim's), at that time the second largest operator of video poker facilities in the State of South Carolina, and plaintiff Ladenburg Thalmann & Co. (Ladenburg) entered into an agreement pursuant to which Ladenburg was appointed Tim's placement agent for the sale of additional debt and equity and Tim's

agreed to provide Ladenburg with warrants entitling Ladenburg to purchase 2.7 percent of Tim's outstanding equity at a penny a share. These warrants have not been delivered.

In December 1996, Tim's and Ladenburg executed a new agreement (the Engagement Agreement) pursuant to which Ladenburg was appointed the exclusive placement agent of any debt or equity of Tim's, with certain exceptions not relevant here, or the securing of bank debt financing or a letter of credit. Ladenburg would be entitled to a private placement fee equal to 7 percent of any equity sold by Tim's and to 4 percent of the face amount of any loan that Ladenburg arranged for Tim's. In addition, Tim's would compensate Ladenburg for its out-of-pocket expenses in connection with the services it performed. The agreement was to terminate upon the earlier of six months or the completion of a sale. However, Ladenburg would be entitled to its private placement fee if a sale of securities was completed by June 30, 1998, with Cerberus Partners, L.P., or two other entities identified in the Engagement Agreement. Following the execution of that agreement, Ladenburg arranged for two loans from Cerberus, of $14 million in April 1997 and $4.5 million in June 1997, and received its placement fee in return.

In September 1997, Samuel Levine, the CEO of Tim's, informed Ladenburg that he intended to change the name of Tim's to Consolidated Route, Inc., and to raise equity capital to repurchase the interest of Tim's other shareholders, retire Tim's debt to Cerberus, and fund a series of acquisitions. Levine also informed Ladenburg that Tim's had retained a private equity agent named Shattan and was considering retaining Goldman Sachs to act as the lead agent in a private placement of a high-yield debt offering and to lead a bank syndication of Tim's securities. Goldman Sachs was to be the sole equity investor in Tim's. Levine promised that Ladenburg would serve as co-manager of the high-yield offering.

In October 1997, Tim's appointed Goldman Sachs, Ladenburg, and Donaldson Lufkin & Jenrette to act as the co-managers of the high-yield offering. Also in October 1997, Cerberus loaned Tim's an additional $5 million. In November 1997, Levine orally guaranteed that Ladenburg would receive a fee for having introduced a transaction in which Tim's would acquire a company named Winstuff and a fee for its work on the high-yield offering.

On December 7, 1997, before the first part of Goldman Sachs's investment was due to close, The Wall Street Journal published an article critical of the video poker industry in

South Carolina. The next day, the Attorney General of South Carolina announced that anyone operating a video poker facility in the State would be subject to arrest. Goldman Sachs soon withdrew from both the proposed debt offering and the equity financing, and Cerberus served Tim's with a notice of default.

Thereafter Ladenburg, Shattan and Tim's agreed on a corporate reorganization entailing the formation of a new corporation, Consolidated Route (ConRoute), to which Tim's would assign its rights and interests in all of its assets, excepting those related to video poker, and its rights to acquire certain companies, including Winstuff. Levine would become the CEO of ConRoute.

On January 20, 1998, Cerberus informed Ladenburg that other potential investors had declined to invest in Tim's and that Cerberus would be the only outside investor in ConRoute. Cerberus agreed to make a nominal common stock investment in ConRoute, which was created on or about March 16, 1998, and a $60 million equity investment in 10 percent payment-in-kind preferred stock. ConRoute also agreed to pay Tim's $6 million. These and other terms were embodied in an asset purchase agreement in February 26, 1998 and executed by both Tim's and ConRoute. As initially contemplated, the equity funding that went to ConRoute would have gone to Tim's. Three days after ConRoute was created, it closed its acquisition of Winstuff, the company Tim's had intended to buy. Levine, now apparently speaking for ConRoute, acknowledged to Ladenburg that ConRoute was obligated to pay Ladenburg a fee in connection with both ConRoute's acquisition of Winstuff and Cerberus's $60 million equity investment. Subsequently, Cerberus made an additional $10 million equity investment in ConRoute.

Neither Tim's nor ConRoute has paid Ladenburg any fees or reimbursed it for its out-of-pocket expenses since Tim's paid the fees in connection with the April and June 1997 loans. Of the six causes of action alleged in the complaint, only the first and third against ConRoute are at issue on this appeal. The first cause of action alleges that Tim's and ConRoute breached the Engagement Agreement by failing to compensate Ladenburg for the October 1997 loan to Tim's, the March 1998 corporate reorganization and recapitalization, including Cerberus's $70 million equity investment, and the acquisition of Winstuff. The third cause of action alleges that Tim's and ConRoute breached the exclusivity provision of the Engagement Agreement by retaining Shattan as the placement agent for the sale of equities by Tim's or ConRoute.

On a motion to dismiss pursuant to CPLR 3211, the court's task is to determine only whether the facts as alleged, accepting them as true and according plaintiff every possible favorable inference, fit within any cognizable legal theory (*Leon v Martinez*, 84 NY2d 83, 87-88). Dismissal pursuant to CPLR 3211 (a) (1) is warranted only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law (*id.*, at 88). While the IAS Court held that ConRoute had no contractual obligations to Ladenburg, our review of the record, including the complaint and the documents submitted by defendants, leads us to conclude that there are factual issues as to ConRoute's succession to Tim's obligations under the Engagement Agreement and as to ConRoute's liability for Ladenburg's fee for arranging the acquisition of Winstuff.

With respect to the Winstuff fee, Ladenburg alleges that Levine, while CEO of Tim's, agreed to pay Ladenburg for its services in connection with the Winstuff acquisition, and in support of this claim, Ladenburg submitted, after briefing was completed on Tim's and ConRoute's motions to dismiss, a letter dated May 12, 1998 from Levine, on ConRoute letterhead, to Steve Feinberg at Cerberus. The letter reports on progress made since closing the asset purchase with Tim's, and takes the occasion "to discuss one loose item that impacts our company, a Ladenburg Thalmann fee for arranging the acquisition of Winstuff and Goodstuff." Levine writes that in the summer of 1997 he asked Brian Gonick, a managing director of Ladenburg, to inquire about the availability of Winstuff for Tim's, that Gonick learned it was available, and that Gonick was instrumental in successfully negotiating the purchase agreement. Levine acknowledges that, although no written agreement was ever drafted, "I told Brian on many occasions that he would be paid a fee." He states that he believes Ladenburg is fully entitled to be paid a fee and "I believe [ConRoute], not Tims [*sic*], should pay this" because "[ConRoute], not Tim's, purchased Winstuff," and explains "The Winstuff fee was not discussed in the Asset Purchase Agreement because both parties assumed it would be paid by [ConRoute], the buyer of Winstuff." The letter concludes, "As your CEO and major shareholder of [ConRoute], I urge you to reconsider paying Ladenburg and I am happy to meet with you personally to discuss this matter further."

General Obligations Law § 5-701 (a) (10) provides that "a contract to pay compensation for services rendered in negotiating * * * the purchase * * * of a business opportunity" is void

"unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent." The note or memorandum need not be prepared or signed with the intention of evidencing the agreement, and it may come into existence subsequent to the execution of the agreement (*Crabtree v Elizabeth Arden Sales Corp.*, 305 NY 48, 53-54). "[I]t is enough, to meet the statute's demands, that [it was] signed with intent to authenticate the information contained therein and that such information does evidence the terms of the contract" (*id.*, at 54). Levine's letter to Feinberg confirms that an agreement to pay Ladenburg existed. In the letter, Levine states that he told Brian Gonick, a managing director of Ladenburg, that Ladenburg would be paid a fee.

That Winstuff was acquired by ConRoute, after the proposed acquisition by Tim's fell apart because the South Carolina Attorney General announced its intention to prosecute video poker operators, does not preclude admission of the letter to support Ladenburg's allegation that there was an oral agreement to pay Ladenburg and an understanding by the CEO of ConRoute that ConRoute would pay because ConRoute made the acquisition. Levine states in the letter that the Winstuff fee was not discussed in the asset purchase agreement because both parties assumed it would be paid by ConRoute, the party that acquired Winstuff. Moreover, Levine was the CEO of Tim's until ConRoute was created, at which point he became the CEO of ConRoute, and he participated in the negotiations culminating in the purchase of Tim's assets by ConRoute. His understanding, as reflected in the letter, manifests an agreement that Ladenburg would be compensated on the same terms to which Tim's had agreed before the intervention of the South Carolina Attorney General necessitated the restructuring of Tim's.

Thus, to the extent that Ladenburg's first cause of action alleges breach of contract against ConRoute in connection with the Winstuff acquisition, Ladenburg should have been granted leave to amend the complaint to plead a breach of contract claim arising out of the agreement to pay an acquisition fee as outlined in Levine's letter. We note that in its brief in opposition to the motion, Ladenburg requested such leave pursuant to CPLR 3211 (e) in the event that its allegations of ConRoute's liability were deemed insufficient.

With respect to whether ConRoute succeeded to Tim's obligations under the Engagement Agreement, both Ladenburg and ConRoute, and the IAS Court, relied upon *Schumacher v Richards Shear Co.* (59 NY2d 239), which discusses the circum-

stances in which a corporation that acquires the assets of another may be held liable for the torts of its predecessor. The four such circumstances are those in which (1) the acquiring corporation expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations (*id.*, at 245).

Ladenburg alleges that the financing it obtained from Cerberus was originally destined for Tim's and was rechanneled into ConRoute; that the reorganization came after Tim's defaulted on its obligations to Cerberus under previous financings; that the transfer of assets left Tim's with only the virtually worthless video poker assets; that Cerberus owns 20 percent of Tim's and 72 percent of ConRoute; that the CEO and COO of Tim's assumed the same positions with ConRoute upon the creation of the latter; and that Tim's and ConRoute maintain their headquarters, respectively, at 25D and 25E Brookfield Oaks Drive, Greenville, South Carolina. The asset purchase agreement provided that the purchase price for Tim's assets was $6 million and it was to be paid in the form of a promissory note; that payment of the note was subject to certain conditions constituting an "Acquisition Threshold"; and that, if the Acquisition Threshold was not met by July 31, 1999, ConRoute would have no obligation to pay any money, and the note would be canceled. In other words, it is possible that no consideration would be given for the assets. In view of the transfer of all Tim's non-video poker assets to ConRoute; the possibility that consideration for the assets is a fiction; the dubious value, after the South Carolina Attorney General's crackdown on video poker operators, of Tim's only remaining assets; and the fact that Tim's executive officers took the same positions with ConRoute, Ladenburg's allegations raise the question whether the transaction between Tim's and ConRoute was devised as a way to avoid Tim's obligations. Construing them liberally (*see,* CPLR 3026; *Leon v Martinez,* 84 NY2d 83, 87), we find that Ladenburg's inartful pleadings intimate that a *de facto* merger was effected (*see, Sweatland v Park Corp.,* 181 AD2d 243). Accordingly, Ladenburg should be permitted to conduct discovery on such issues as Tim's ongoing business, the identities of its present officers, and whether it ever received consideration from ConRoute for its assets. Concur—Mazzarelli, J. P., Ellerin, Lerner, Andrias and Friedman, JJ.