UNITED RESOURCE RECOVERY CORP., Plaintiff,

v.

RAMKO VENTURE MANAGEMENT, INC. and John Kohut, Defendants.

Ramko Venture Management, Inc., Third–Party Plaintiff,

v.

Carlos Gutierrez, Third–Party Defendant.

No. 07 Civ. 9452.

United States District Court, S.D. New York.

Oct. 28, 2008.

**648**

Porzio, Bromberg & Newman, P.C., by: Gary M. Fellner, Esq., New York, NY, for Plaintiff, United Resource Recovery Corporation and Third–Party Defendant Carlos Gutierrez.

Lloyd S. Clareman, Esq., New York, NY, for Defendants.

### OPINION

SWEET, District Judge.

Plaintiff United Resource Recovery Corporation ("Plaintiff" or "URRC") has moved pursuant to Rule 12(c), Fed. R.Civ.P. to dismiss the answer and counterclaims of Defendant Ramko Venture Management Inc. ("Ramko"). Upon the conclusions set forth below, the motion is granted in part and denied in part.

This dispute has arisen between URRC, a start-up company, and John Kohut ("Kohut" and collectively with Ramko, "Defendants") and his company Ramko, over Defendants' asserted right to compensation for financial services allegedly performed by Defendants, including efforts to obtain financing for URRC.

## I. PRIOR PROCEEDINGS

On February 20, 2007, URRC filed a Complaint against Ramko and Kohut in the United States District Court for the District of South Carolina seeking a declaration that the Defendants are not entitled to fees, expenses or other compensation beyond consulting fees of $8,500 per month, beginning in 2005, consistent with a written agreement between the parties. Complaint ¶¶ 14, 17.

On April 4, 2007, Defendants filed an Answer and Counterclaim and Third–Party Complaint ("Answer") against URRC and its principal, Carlos Gutierrez ("Third–Party Defendant" or "Gutierrez").

Ramko moved to transfer the action to the Southern District of New York which motion was granted by an Order dated October 15, 2007.

The instant motion was heard and marked fully submitted on April 16, 2008.

## II. DEFENDANTS' ALLEGATIONS

The Answer contains four defenses that deny certain of the allegations of the Complaint and allege Defendants' version of the events that took place, Answer ¶¶ 1–24, and then engages in a lengthy exposition of the background of the controversy. *Id.* ¶¶ 32–53.

Defendant Ramko also asserts five counterclaims: (1) breach of contract, *id.* ¶¶ 54–59; (2) unjust enrichment, *id.* ¶ 60–

64; (3) quantum meruit, *id.* ¶¶ 65–67; (4) promissory estoppel, *id.* ¶¶ 68–71; and (5) fraud. *Id.* ¶¶ 72–80. All five claims are asserted against URRC; only the last two are asserted against Gutierrez.

The Answer is not a model of clarity. It is largely based on two agreements dated January 2, 2004, relating to financing services proposed by the Defendants: the "Break-up Agreement" and the "Past Work Agreement," another January 2004 agreement outlining a potential private placement which is titled the "Summary of Terms," and unexecuted revisions of those agreements dated December 10, 2004. The counterclaims also rely on alleged oral representations by Gutierrez.

Defendants allege that URRC and Ramko began their relationship in or around 2001 pursuant to a written agreement dated August 17, 2001. Answer ¶ 33. URRC had developed a "proprietary 'bottle-to-bottle' waste-recycling technology 'capable of extracting reusable new material from used plastic bottles'" and was running a silver recycling business. *Id.* Ramko was engaged to provide assorted consulting and financial services on a day-to-day basis to URRC (i.e. to help in accounting matters, provide long-range financial guidance), and to provide investment banking services "of different sorts at different times." *Id.* Among these services, Ramko was hired to try to arrange a private placement of $7.2 million to raise capital for URRC. *Id.* ¶ 6. No such placement occurred, and the 2001 agreement was superseded by a subsequent written fee agreement reached in 2002. *Id.* Similar equity capital was again sought in 2002 by way of private placement, but again Ramko was unsuccessful and earned no fee, and the 2002 agreement was superseded by a subsequent agreement. *Id.* ¶ 7.

Between 2001 and 2003, Ramko performed extensive services of various types for URRC with the expectation of being paid, for which it received no compensation. These services included a broad array of financial consulting services, including services of the type that would normally be performed by an in-house CFO as well as those that would typically be within the expertise of an outside investment banker.

*Id.* ¶ 49. Gutierrez promised Kohut repeatedly that Ramko would be "taken care of" when URRC raised financing. *Id.*

In January 2004, the parties entered into an agreement set forth in three separate documents. *Id.* ¶ 38. One of those writings was a "Summary of Terms" outlining a private placement that Ramko was to try to secure on URRC's behalf. The agreement contemplated an $8 million private placement in exchange for a 40 percent interest in URRC. *Id.* ¶ 38, Am. Ex. A at 6. The Summary of Terms contained a 180–day exclusivity period and an approximate closing date of June 30, 2004. *Id.*, Am. Ex. A at 11. If it successfully obtained such funding, Ramko would be entitled to a commission of ten percent of the capital raised ($800,000), a fixed expense allowance of three percent ($240,000), and certain warrants. *Id.*, Am. Ex. A at 7.

A separate signed letter dated January 2, 2004, provided for a "break-up fee" payable to Ramko under certain conditions:

> [S]hould Ramko be in the position to close such transactions, on substantially the terms outlined [in the Summary of Terms], and if, for any reason [URRC] chooses to accept alternative funding or a strategic investment, Ramko shall be entitled to, as a break-up fee, compensation equal to its minimum fee ($300,000 plus warrants) less any amount contractually due and payable or paid under the enclosed Summary of Terms.

*Id.* ¶ 38, Am. Ex. A at 2.

Another letter, also dated January 2, 2004, the "Past Work Agreement," stated, *inter alia:*

Ramko and [URRC] have agreed that in consideration of past work on [URRC's] behalf, [URRC] shall issue to Ramko or its designee a 10 year warrant to purchase up to 4,000 shares (post private placement closing) of the Company's common stock exercisable, inclusive of a cashless exercise option, at $200 per share (based on the capital structure outlined in the Summary of Terms).

*Id.*, Am. Ex. A at 4.

Ramko identified Founders Equity SBIC, LLP ("Founders") as a potential investor. *Id.* ¶ 39.

Founders reviewed URRCs business plan and related underlying projection . . . which demonstrated a need over time for a total of $16 million in new equity and advertised a willingness on the part of URRC to cede existing shareholder control in exchange for that level of capital. Founders noted that URRC's plan was to raise $8 million initially and then the second $8 million later, but Founders came to the conclusion, towards the end of 2004, that it did not want to rely on the vagaries of URRC's ability to raise the second $8 million. Founders accordingly advised URRC in late 2004 that Founders would be willing to explore a transaction with URRC pursuant to which Founders would invest $15 million in exchange for immediate control of URRC, thereby obviating the need for a second round of financing later on.

*Id.*

URRC instructed Ramko to proceed with discussions with Founders on this basis. *Id.* ¶ 40. Ramko then prepared and sent URRC revisions of the January, 2004 papers: a new preliminary Summary of Terms, a side letter dated December 10, 2004, and another letter agreement dated December 10, 2004 (collectively, the "December 2004 Revisions"). *Id.* ¶ 41, Ex. B.

According to the proposed Summary of Terms, Ramko would try to arrange for up to $25 million in equity financing in exchange for a controlling 62.5% interest in URRC. *Id.*, Ex. B at 6.

The proposed Summary of Terms contained a 180–day exclusivity period and an approximate closing date of June 30, 2005. *Id.*, Ex. B at 11.

A separate letter dated December 10, 2004, accompanying the Summary of Terms again provided for a "break-up fee" of $300,000 plus warrants in URRC if Ramko secured funding "on substantially the terms outlined" in the new proposed Summary of Terms and URRC accepted alternative funding. *Id.* ¶ 46, Ex. B at 2.

None of the December 2004 Revisions were ever signed. *Id.* ¶ 41, Ex. B. However, Defendants assert that Gutierrez told Kohut that the December 10, 2004 Unsigned Revisions in fact represented URRC s agreement with Ramko, and that he was willing to sign them. *Id.* However, Kohut and Gutierrez agreed that there was no need to actually sign the documentation at that time. *Id.* Ramko contends that these three documents

represent the parties' oral agreement regarding the revised terms of Ramko's compensation within the context of the larger, $15 million deal that was now, as of later 2004, being discussed; and these remained the agreed-upon terms of Ramko's compensation going forward.

*Id.*

Ramko asserts that it continued to provide "additional services" to URRC, "similar in scope to its prior services, for the remainder of 2004 and the first five months of 2005, for which Ramko has received no compensation." *Id.* ¶ 51.

URRC and Founders entered into a non-binding Letter of Intent ("LOI") on July 15, 2005, "pursuant to which Found-

ers would invest $15 million in exchange for 62.5% of URRCs equity." *Id.* ¶ 42, Ex. C at 23. The deal never went through. Founders later sued URRC and Gutierrez, and the suit settled. *Id.* ¶ 43.

Founders was "ready, willing and able to close on the transaction contemplated by the July 15, 2005 Letter of Intent." *Id.* URRC "reneged on" the Founders deal in October 2006 so that it could pursue "superior alternatives, namely potential deals with a company called NTR, and/or a potential deal with The Coca–Cola Company." *Id.* ¶¶ 43, 44. URRC is currently in negotiations with NTR and Coke regarding alternative funding and/or a strategic investment. *Id.* ¶ 45.

In the spring of 2005, the parties signed a "Consulting Agreement," dated May 27, 2005, pursuant to which Ramko was paid $8,500 per month for consulting services. Fellner Decl., Ex. 5; Answer ¶¶ 10, 36, 52. URRC paid Ramko $8,500 per month through the date of filing under the Consulting Agreement. Complaint ¶ 11; Answer ¶ 12. The Consulting Agreement covered all consulting "services" Ramko could provide for six and a quarter days each month that would be "reasonably requested by ... [URRC]. These services shall be ... as a consultant and advisor, such services to be substantially similar to those performed by a principal financial officer." Fellner Decl. Ex. 5 at 1. The Consulting Agreement further states that

8. Additional Services....

(b) Any service, other than the Services, including but not limited to investment banking services performed by Consultant for the Company, are not covered by, nor subject to the terms and provisions of this Agreement, and compensation for and the conditions for the performance of such services are or shall be the subject of separate agreements mutually agreeable to the parties thereto.

\* \* \*

14. Entire Agreement. This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof and supersedes all negotiations, prior discussions, and preliminary agreements made prior to the date hereof. This agreement may be amended or replaced only in writing executed by all parties hereto.

*Id.*, Ex. 5 at 5.

Ramko performed investment banking services for URRC in 2005, chiefly in connection with URRC's acquisition of a silver recycling business called DMS, for which no compensation has been paid. *Id.* ¶ 36.

## III. THE 12(C) STANDARD

A motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) is governed by the same standard applicable to a motion under Fed.R.Civ.P. 12(b)(6). *Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir.2001). All factual allegations are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007)). A complaint should not be dismissed on a motion for judgment on the pleadings unless it appears beyond doubt that the plaintiff can prove no set of facts in sup-

port of its claims that would entitle it to relief. *Faconti v. Potter*, 242 Fed.Appx. 775, 777 (2d Cir.2007).

## IV. DISCUSSION

■ Ramko's overlapping counterclaims variously assert the right to three categories of relief: (1) a break-up fee on the Founders deal; (2) compensation for the work "reflected" in the Past Work Agreement performed over a period of 2001 to May 2005; and (3) compensation for investment banking services rendered in 2005.

### A. *Defendants' Counterclaim for Breach of Contract Is Dismissed In Part*

■ Under New York law, the elements of a breach of contract claim are (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir.2004).

Defendants' first counterclaim in fact asserts two separate breach of contract claims: the first seeks to recover a "break-up fee," and the second seeks to recover compensation for pre–2005 services based on the Past Work Agreement or, alternatively, an oral contract based on representations by Gutierrez.

### 1. Ramko's Contract Claim for a Break-up Fee Is Dismissed

The Answer does not specify the contract under which Ramko asserts the right to recover a break-up fee. In its opposition to this motion, Ramko argues that there are two contracts under which it has this right: the January 2004 Break-up Agreement and the unsigned December 2004 revision of that agreement. See Def. Opp. at 14.

With regard to the January 2004 Break-up Agreement, the Complaint concedes that Ramko was only entitled to a break-up fee "if an investor were ready to close on a transaction as outlined in the 'Summary of Terms' but URRC, for any reason, chose to accept alternative funding or an investment from some other source." Answer ¶ 38. The actual contract language reads: "[S]hould Ramko be in the position to close such transactions, on substantially the terms outlined, and if, for any reason, the Company chooses to accept alternative funding or a strategic investment, Ramko shall be entitled to, as a break-up fee, compensation ...." *Id.*, Am. Ex. A at 2.

The January 2004 Summary of Terms contemplated an $8 million private placement in exchange for a 40 percent interest in URRC. *Id.*, Am. Ex. A at 6. The Summary of Terms also contained a 180–day exclusivity period and an approximate closing date of June 30, 2004. *Id.*, Am. Ex. A at 11. Ramko alleges that it identified Founders as a potential investor, but that Founders rejected the opportunity to invest $8 million, and instead proposed a transaction "pursuant to which Founders would invest $15 million in exchange for immediate control of URRC ...." *Id.* ¶ 39. This is the only opportunity that Ramko claims to have identified with regard to the Break-up Agreement.

As applied to this set of facts, the language of the Break-up Agreement is unambiguous. *See Eternity Global*, 375 F.3d at 178 ("A contract may be ambiguous when applied to one set of facts but not another ...." (quotation and alteration omitted)). There is no legally permissible interpretation of the Break-up Agreement that would deem the transaction proposed by Founders, involving an investment of almost twice the value contemplated by the Summary of Terms and transfer of a controlling rather than a minority stake in

URRC, to be "on substantially the terms outlined" by the Summary of Terms. Ramko is therefore not entitled to recover a break-up fee under the Break-up Agreement.

■ Ramko argues that at the time the Break-up Agreement was entered into, URRC contemplated raising a total of $16 million in two tranches of $8 million each, and that Ramko found a party ready to provide not only the first $8 million, "but all of URRC's equity needs in a single round." Def. Opp. at 14. This argument relies on Kohut's testimony, certain URRC financial documents and the URRC 2003 Business Plan. *See id.* Under the parol evidence rule, "such extrinsic evidence may not be used to modify, explain, vary or supplement the written integrated contract." *Gualandi v. Adams*, 385 F.3d 236, 241 (2d Cir.2004); *see also Lee v. BSB Greenwich Mortgage Ltd. P'ship*, 267 F.3d 172, 178 (2d Cir.2001) ("Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms, and resort to parol evidence is not only unnecessary but improper." (internal quotations, citations and alterations omitted)); *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir.1999) ("If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself."). Ramko's argument flies in the face of the plain language of the Break-up Agreement, and must therefore be rejected.

■ To the extent that Ramko's claim is premised on the December 2004 Revisions, it is barred by the New York Statute of Frauds, which states:

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of . . . a business opportunity, business . . . or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest.

"Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation . . . .

N.Y. Gen. Oblig. Law § 5–701. The New York Court of Appeals has warned that "[t]oo broad an interpretation would extend the writing requirement to unintended situations. For instance, the typical stockbroker's dealings might be covered." *Freedman v. Chem. Constr. Corp.*, 43 N.Y.2d 260, 401 N.Y.S.2d 176, 372 N.E.2d 12, 16 (1977). However,

[t]oo restrictive an interpretation would defeat the purpose of the legislation. Because in some circumstances the important services of an intermediary may be accomplished in the course of a few and even momentary conversations, false or exaggerated claims can be asserted easily and disproved only with difficulty. It is this type of situation to which the statute is addressed.

*Id.* See also *Sugerman v. MCY Music World, Inc.*, 158 F.Supp.2d 316, 322–23 (S.D.N.Y.2001) ("New York is . . . interested in protecting against 'contract cases which all too often degenerate[ ] into swearing contests' and with the attendant risk of perjury.' ") (alteration in original) (quoting *Merex A.G. v. Fairchild Weston*

*Sys., Inc.,* 810 F.Supp. 1356, 1366 (S.D.N.Y.1993)).

Ramko does not dispute that the Statute of Fraud applies, but argues that in cases involving multiple, related documents, the Statute of Frauds does not require that every document be signed, citing *Royal Air Maroc v. Servair, Inc.,* 603 F.Supp. 836, 841 (S.D.N.Y.1985). The rule, as stated in *Royal Air Maroc,* is that "an integration of several documents satisfies the writing requirement of the statute where they refer to the same subject matter, together contain all the material terms, and at least one of which is signed or prepared by the party to be charged." *Id.* at 841. In *Royal Air Maroc,* there were a number of signed documents that acknowledged defendant's acquiescence to the terms of the alleged contract. *See id.* ("[Counterclaim defendant's] telex of May 1984, its letter dated May 23, 1984, and its cancelled checks in payment of [Counterclaimants] invoices for the 17–month period subsequent to March 31, 1983 all are further signed documents which acknowledge the continued existence of the terms of the Agreement in addition to Amendment No. 1.").

In contrast, here, Ramko has pointed to no document that "[was] signed with intent to authenticate the information contained therein and that such information does evidence the terms of the [alleged] contract." *Ladenburg Thalmann & Co., Inc. v. Tim's Amusements, Inc.,* 275 A.D.2d 243, 712 N.Y.S.2d 526, 529 (App.Div.2000) (quoting *Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 110 N.E.2d 551, 553 (1953)). Ramko seeks to rely upon an April 20, 2005 letter from Gutierrez to Founders in which he asked whether $375,000 was "part of John's fee?" Def. Opp. 14. Although this confirms that some fee was contemplated, it does not refer to the December 2004 Revisions or reflect its terms, nor does it indicate how, when or under what conditions a fee would be paid, what the fee would be, or who would pay it.

■ Ramko also relies on the doctrine of part performance, arguing its performance should take the December 2004 Revisions out of the Statute of Frauds. The doctrine of part performance, however, is not an exception to the subsection of the General Obligations Law at issue. *See Belotz v. Jefferies & Co., Inc.,* 213 F.3d 625 (2d Cir.2000) ("Section 5–701(a)(10) does not expressly provide a part performance exception, and the New York Court of Appeals has firmly stated that there is no such exception."); *see also Sea Trade Co. Ltd. v. FleetBoston Fin. Corp.,* 03 Civ. 10254(JFK), 2004 WL 2029399 at *4–5 (S.D.N.Y.2004) ("The partial performance exception to the statute of frauds applies to those agreements governed by § 5–703 of the General Obligations law ... no such exception has been recognized with respect to agreements governed by § 5–701."); *Nemelka v. Questor Mgmt. Co. LLC,* 40 A.D.3d 505, 836 N.Y.S.2d 598, 599 (2007) ("The exception to the statute of frauds for part performance does not apply to General Obligations Law § 5–701(a)(10).").

■ Ramko's final argument on this issue is that its relationship with URRC was "so extensive" that the Statute of Frauds' writing requirement can be overlooked. Def. Opp. 18–19. In both of the cases upon which Ramko relies for this proposition, the court found that section 5–701(a)(10) did not apply because a finder of fact could determine that the plaintiff was defendant's employee. *See Seneca Ins. Co. v. Morelli,* 95 Civ. 10701(JSM), 1996 WL 312230 at *2 (S.D.N.Y.1996) (concluding that plaintiff had alleged facts from which a factfinder could conclude that plaintiff "was an employee rendering services, not a finder or negotiator"); *Riley v. N.F.S. Servs., Inc.,* 891 F.Supp. 972 (S.D.N.Y.1995) (holding that a jury could

reasonably conclude that plaintiff was "hired as a Senior Vice President, to head a new division of [defendant] and that he had numerous responsibilities for which he was paid a compensation package"); *see also Streit v. Bushnell,* 424 F.Supp.2d 633, 642 (S.D.N.Y.2006) ("[T]he complaint suggests that the parties had maintained an employment relationship that began in 1995 under what in form and substance may be properly deemed an employment contract that New York courts have held are not subject to NYGOL § 5-705(a)(10).").

■ It is the nature of the alleged agreement, and not the parties' relationship, that governs whether section 5-701(a)(10) applies. *See* N.Y. Gen. Oblig. Law § 5-701(a)(10) (stating that an agreement, promise or undertaking is void unless in writing and subscribed to by the party to be charged therewith if it "is a contract to pay compensation for services rendered in negotiating ... the purchase, sale, exchange, renting or leasing ... of a business opportunity, business, its good will, inventory, fixtures or an interest therein ...."); *see also Streit,* 424 F.Supp.2d at 641; *Seneca,* 1996 WL 312230, at *2; *Riley,* 891 F.Supp. at 974. Here, the alleged agreement to pay a break-up fee relates only to Ramko's allegation that it "negotiated a deal, consistent with URRC's stated criteria, with a firm called Founders, which was ready, willing and able to close on the deal." Answer ¶ 34. Ramko does allege that it "performed extensive services of various types for URRC with the expectation of being paid." *Id.* at ¶ 49. However, Ramko does not claim that the alleged agreement reflected in the December 2004 Revisions applies to that work, but rather seeks compensation for that work under separate claims. The language of the December 2004 revision of the Break-up Agreement applies only to the attempt to secure equity funding for URRC. *See id.,* Ex. B at 2

("This is to confirm our conversation wherein Ramko Venture Management ("Ramko") and its affiliate ... have agreed, on a best efforts basis, to attempt to place an equity funding for URRC. Further, we have agreed that should Ramko be in the position to close such transactions, on substantially the terms outlined, and if, for any reason, the Company chooses to accept alternative funding or a strategic investment, Ramko shall be entitled to ... a break-up fee ....").

The Statute of Fraud therefore bars Ramko's contract claim for a break-up fee based on the December 2004 Unsigned Revisions.

### 2. The Motion To Dismiss Is Denied as to Ramko's Contract Claim Seeking Compensation for Pre-2005 Services

■ Ramko also claims it is entitled to compensation for "a broad array of financial consulting services, including services of the type that would normally be performed by an in-house CFO as well as those that would typically be within the expertise of an outside investment banker." Answer ¶ 49. According to Ramko, it is owed compensation for these services dating from some time in 2001 through May 2005. *Id.* ¶ 51. Ramko alleges that "Gutierrez promised Kohut repeatedly that Ramko would be 'taken care of' when URRC raised financing. Kohut, on behalf of Ramko, was willing to provide services based upon Gutierrez's promises because he believed in URRC's technology and was willing to take the risk that URRC would be successful." *Id.* ¶ 49. The claim is premised on oral representations by Gutierrez and the Past Work Agreement.

The Past Work Agreement, set forth in a letter dated January 2, 2004, states that

Ramko and the Company [URRC] have agreed that in consideration of past

work on the Company's behalf, the Company shall issue to Ramko or its designee a 10 year warrant to purchase up to 4,000 shares (post private placement closing) of the Company's common stock exercisable, inclusive of a cashless exercise option, at $200.00 per share (based on the capital structure outlined in the Summary of Terms).

*Id.,* Am. Ex. A at 4; *see also id.* ¶ 50. This agreement is unenforceable because it fails to meet New York's statutory requirements for an enforceable contract for past consideration.

■ "The general rule in New York is that past consideration is not consideration, because the promise was not induced by the consideration." *Arnone v. Deutsche Bank, AG,* 02 Civ. 4915(MGC), 2003 WL 21088514, at *3 (S.D.N.Y. May 13, 2003). Past consideration, however, is valid in New York if there is a writing signed by the party to be bound. N.Y. Gen. Oblig. Law § 5–1105. For a party to recover pursuant to section 5–1105, "the writing must contain an unequivocal promise to pay a sum certain, at a date certain, and must express consideration for the promise." *Umscheid v. Simnacher,* 106 A.D.2d 380, 482 N.Y.S.2d 295, 297 (1984).

Here, the consideration was not "expressed" within the meaning of section 5–1105. In *Umscheid,* the Appellate Division held that "the consideration alluded to in the documents, viz., services rendered on the respondent's behalf, is vague, imprecise, and, indeed, without meaning. In short, resort to evidence extrinsic to the documents is necessary to give meaning to the consideration 'expressed' in those documents." *Id.* at 297–98. The alleged contract was therefore unenforceable. *Id.* Here, the consideration alluded to, "past work on the Company's behalf," is indistinguishable from the contract language addressed by *Umscheid.* The Past Work Agreement is therefore unenforceable.

*See also Arnone,* 2003 WL 21088514, at *4 (holding that the relevant document did not sufficiently state the consideration provided by plaintiff).

■ However, Ramko's contract claim does not rely exclusively on the Past Work Agreement, but also on a prior oral agreement that was "reflected in the January 2004 Past Work Agreement." Def. Opp. 19. Ramko's breach of contract claim alleges that "Ramko was promised, orally and as reflected in the Past Work Agreement, compensation for the extensive pre-June 2005 services to URRC . . . ." Answer ¶ 57; *see also id.* ¶ 49 ("Gutierrez promised Kohut repeatedly that RamKo would be 'taken care of' when URRC raised financing."). URRC has failed to demonstrate that Ramko's counterclaim for breach of this alleged oral contract should be dismissed.

As URRC points out, Ramko alleges that it was to be paid only in the event that URRC obtained capital investment. *See id.* ¶ 49 ("Gutierrez promised Kohut repeatedly that Ramko would be 'taken care of' when URRC raised financing."); *id.* ¶ 57 ("[I]t was always understood that those services were not being provided gratis and that Ramko would be paid the reasonable value of those services ... when URRC's financial condition enabled it to make such payment."). The Answer also alleges that Ramko was willing to assume the risk of not being compensated for its work in the event that URRC failed to obtain financing: "Kohut, on behalf of Ramko, was willing to provide services based upon Gutierrez's promises because he believed in URRC's technology and was willing to take the risk that URRC would be successful." *Id.* Thus, as alleged by Ramko, URRC's obligation to compensate Ramko for its work from 2001 to May 2005 was subject to the condition precedent that URRC obtained capital funding. URRC

argues that Ramko's counterclaim should be dismissed for failure to plead compliance with this condition precedent.

■ It is true that Ramko does not allege that URRC has obtained the capital investment upon which Ramko's compensation is conditioned. However, "under New York law, the failure of a plaintiff to comply with conditions precedent is an affirmative defense." *Endovasc, Ltd. v. J.P. Turner & Co., LLC,* 169 Fed.Appx. 655, 657 (2d Cir.2006). Thus, Ramko is under no obligation to affirmatively plead compliance with conditions precedent. *See* N.Y. C.P.L.R. 3015(a) ("The performance or occurrence of a condition precedent in a contract need not be pleaded."); *1199 Hous. Corp. v. Int'l Fid. Ins. Co.,* 14 A.D.3d 383, 788 N.Y.S.2d 88, 89 (2005) ("[T]he burden to plead 'specifically and with particularity' that any condition precedent has not been fulfilled rests on the party resisting enforcement of the contract.").

■ URRC also argues that Ramko's contract claim based on the alleged oral agreement is barred by the May 2005 Consulting Agreement, under which URRC paid Ramko $8,500 monthly for two years beginning in June 2005. *See* Complaint ¶ 11; Answer ¶ 12. Section 14 of the Consulting Agreement states that the agreement "constitutes the entire understanding between the parties with respect to the subject matter hereof and supersedes all negotiations, prior discussions, and preliminary agreements made prior to the date hereof." Fellner Decl. Ex. 5 at 5. URRC argues that Ramko's claims for compensation for past work are superseded by the Consulting Agreement, relying on sections 14 and 8(b), which states that compensation for any services other than those defined in the agreement "shall be the subject of separate agreements mutually agreeable to the parties thereto." *Id.* at 4.

The Consulting Agreement does not define its "subject matter," and URRC's motion has not addressed the meaning of the term. However, paragraph one of the Consulting Agreement states that "[Ramko] agrees to provide the services of a skilled professional … commencing June 1, 2005 … such services to be substantially similar to those performed by a principal financial officer…. Unless otherwise agreed … Consultant shall perform the Services at an office of the Consultant …. The Company agrees that Consultant shall have ready access to the Company staff and resources as necessary …." *Id.* at 1. This language may be reasonably interpreted to indicate that the contract's "subject matter" amounts to Ramko's services, as defined, to be provided commencing June 1, 2005. There is no indication that the Consulting Agreement was intended to address work performed by Ramko prior to that date.

The motion to dismiss Ramko's counterclaim for breach of contract as relates to consulting services rendered prior to June 1, 2005, is denied.

**B. *The Motion To Dismiss the Quantum Meruit, Unjust Enrichment and Promissory Estoppel Claims Is Granted as Relates to Services Provided in Connection with the Founders and DMS Transactions, and Otherwise Denied***

Ramko's second and third causes of action, for quantum meruit and unjust enrichment, each seek recovery for two distinct categories of services: (1) services Ramko allegedly provided in connection with the Founders transaction, and (2) alleged "services in respect of 'past work' performed pre–2005." *See* Answer ¶¶ 62–63, 66. Ramko's fourth cause of action, for promissory estoppel, seeks compensation for those two categories of services and for

investment banking services allegedly performed during 2005 related to URRC's acquisition of a company referred to in the Answer as "DMS." *See id.* ¶¶ 53, 70.

■■■■ To plead a claim for quantum meruit under New York law, a party must allege "(1) the performance of the services in good faith; (2) the acceptance of services by the person to whom they are rendered; (3) an expectation of compensation, therefor; and (4) the reasonable value of the services." *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 66 (2d Cir.1999) (quotations omitted). Courts may "analyze quantum meruit and unjust enrichment together as a single quasi contract claim." *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005); *see also Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 768 F.Supp. 89, 96 (S.D.N.Y.1991) ("[Q]uantum meruit and unjust enrichment are not separate causes of action. Rather, unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as he deserves,' is one measure of liability for the breach of such a contract." (citation omitted)), *rev'd on other grounds*, 959 F.2d 425 (2d Cir.1992).

■■■■ Ramko's counterclaims for quantum meruit and unjust enrichment must be dismissed to the extent they seek compensation in connection with the alleged Founders transaction. New York General Obligations Law § 5–701(a)(10) extends "to a contract implied in fact or in law." *See Minichiello v. Royal Bus. Funds Corp.*, 18 N.Y.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966) (holding that the 1964 amendment to section 5–701(a) (10) clearly precludes any recovery in quantum meruit); *see also Prescient Acquisition Group, Inc. v. MJ Publ'g Trust*, 05 Civ. 6298(PKC), 2006 WL 2136293, at *5 (S.D.N.Y.2006) ("In New York, a plaintiff may not assert an action under a theory of unjust enrichment in order to circumvent the writing requirement of the Statute of Frauds."); *Zeising v. Kelly*, 152 F.Supp.2d 335 (S.D.N.Y.2001) ("In a breach of contract case, '[t]he requirement of a writing cannot be circumvented by an action for compensation in *quantum meruit.*' " (quoting *Orderline Wholesale Distribs., Inc. v. Gibbons, Green, van Amerongen, Ltd.*, 675 F.Supp. 122, 128 (S.D.N.Y.1987))).

■■■■ Ramko's promissory estoppel claim is likewise subject to the Statute of Frauds. "To invoke the power that equity possesses to trump the Statute of Frauds, plaintiff must demonstrate 'unconscionable' injury, *i.e.,* injury beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement." *Merex*, 29 F.3d at 826; *see also Sugerman* 158 F.Supp.2d at 325 ("Under New York law, the use of promissory estoppel to overcome the State of Frauds has been strictly limited to those rare cases when the circumstances render the denial of recovery 'unconscionable.' " (quotation omitted)). The "break-up fee" sought by Ramko is no more than the expectation damages which flow naturally from the non-performance of the alleged agreement. *Cf. Philo Smith & Co., Inc. v. USLIFE Corp.*, 554 F.2d 34, (2d Cir.1977) (affirming dismissal of complaint where plaintiffs' only substantial injury was loss of finder's fee); *Weissman v. Seiyu, Ltd.*, 98 Civ. 6978(HB), 2000 WL 42205 at *10 (S.D.N.Y.2000) ("[P]laintiff's loss of his commission and purported damage to his reputation ... are not enough to rise to the level of unconscionability."); *Ellis v. Provident Life & Accident Ins. Co.*, 3 F.Supp.2d 399, 410 (S.D.N.Y.1998) (holding that payments allegedly due former employee on commissions from renewal of insurer's policies did not constitute "unconscionable" injury). To the extent that it seeks recovery of services provided by

Ramko in connection with the Founders' transaction, the promissory estoppel claim is therefore dismissed.

Ramko also asserts its guasi-contract claims in the alternative to its contract claim seeking compensation for pre–2005 services "reflected" in the Past Work Agreement. *See* Answer ¶¶ 51, 61, 63, 66.

URRC argues that the existence of the Past Work Agreement precludes Ramko's quasi-contract claims, citing *R.B. Ventures, Ltd. v. Shane* for the proposition that "[claims for unjust enrichment or quantum meruit] are non-contractual, equitable remedies that are inapplicable if there is an enforceable contract governing the subject matter," 112 F.3d 54, 60 (2d Cir.1997). *See* Pl. Mem. at 18. As discussed above, the Past Work Agreement is not an enforceable contract, and *R.B. Ventures* is therefore inapposite. The motion to dismiss Ramko's quasi-contract claims is denied with respect to the pre–2005 services reflected in the Past Work Agreement.

 In addition to compensation for the services reflected in the Past Work Agreement, Ramko's promissory estoppel claim also seeks compensation for "investment banking services" provided to URRC "in connection with URRC's acquisition of a silver recycling business called DMS." Answer ¶ 53. According to Ramko, Gutierrez promised "that this assignment would generate a fee for Ramko consistent with normal investment banking fees if it were consummated," and that Ramko provided such services "in reasonable expectation of receiving ordinary and customary compensation for the value of its services . . . ." *Id.* This claim falls squarely within N.Y. Gen. Oblig. Law § 5–701(a)(10), and must therefore be dismissed. Ramko argues that the Consulting Agreement carves out "investment banking services performed by [Ramko]," and therefore expresses URRC's recognition that such services were being provided. Def. Opp. 22.

Even if this were the case, Ramko has pointed to no signed document that evidences the terms of the contract, *see Ladenburg*, 712 N.Y.S.2d at 529; *supra* at IV.A.1; nor has Ramko alleged "unconscionable injury." *See supra* at IV.B.

### D. *Ramko's Fraud Claim Is Dismissed*

 Ramko's fraud claim alleges that URRC and Gutierrez promised to pay Ramko a fee for its services related to a potential deal with Founders and a breakup fee if a deal went forward with NTR, but that Gutierrez, at the time of the purported agreements, never actually intended to pay Ramko. Answer ¶¶ 73–78. Although there is some uncertainty on the proper interpretation of New York law on the question, *see Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F.Supp.2d 231, 244–45 (S.D.N.Y.2006), the Court of Appeals for the Second Circuit has repeatedly held that New York law does not permit an action for fraud where the plaintiff alleges only that defendant entered into a contract with no intention of performing. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19–20 (2d Cir.1996) ("[I]ntentionally false statements by [defendant] indicating his intent to perform under the contract . . . . [are] not sufficient to support a claim for fraud under New York law."); *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir.1995) ("A cause of action does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing."); *see also TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 90 (2d Cir.2005) ("[U]nder New York law, the failure to disclose an intention to breach is not actionable as fraudulent concealment."). "To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty

to perform, under the contract, or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone,* 98 F.3d at 20 (citations omitted). Ramko's fraud claim meets none of these requirements, and is therefore dismissed.

### Conclusion

The motion of URRC is granted as to Ramko's counterclaims seeking a fee related to the Founders and DMS deals, including the fraud claim, which are dismissed. The motion is denied as to Ramko's contract and equitable claims seeking compensation for the services "reflected" in the Past Work Agreement. Leave to replead within 20 days is granted.

It is so ordered.