■ Noise In The Attic Productions, Inc., Respondent, v London Records et al., Defendants. UMG Records, Inc., Third-Party Plaintiff, v Cheryl James et al., Third-Party Defendants-Appellants. [782 NYS2d 1]—

Order, Supreme Court, New York County (Richard B. Lowe, III, J.), entered December 8, 2003, which, following a jury trial, directed the entry of judgment in favor of plaintiff on its breach of contract cause of action, awarded plaintiff the sum of

$540,707.17 reflecting the amount of royalty payments in dispute and directed that plaintiff continue to receive future royalty payments in dispute and disburse payments in accordance with the parties' prior agreements, unanimously reversed, on the law, with costs and disbursements, to direct the entry of judgment in favor of third-party defendants Cheryl Wray[1] and Sandra Denton, professionally known as Salt 'N Pepa (SNP), to award SNP $540,707.17 in disputed record royalties presently being held by Supreme Court and to direct that all future royalties earned on sales of SNP records be paid to SNP until the $1.6 million advance made in 1997 against plaintiff's share of such royalties is recouped.

Plaintiff Noise In The Attic Productions, Inc. (NITA), with which recording artists, Cheryl Wray and Sandra Denton had entered into a production contract providing for a division of royalties on SNP's fourth and fifth albums (not yet recorded) between SNP and NITA (Wray and Denton would receive slightly less than one third each with NITA to be paid slightly more than one third), seeks to recover for breach of contract against three record companies based on their failure to pay royalties. One of the record companies, defendant Universal Music Group Inc. (UMG) impleaded SNP, seeking indemnification and contribution as to part of NITA's claim. At the time NITA and SNP entered into the aforementioned production contract, NITA, Wray and Denton, on the one hand, and London Records, a defendant herein, on the other, entered into a contract for the distribution of SNP's records. Under this contract, London acquired all of its predecessor recording company's rights to SNP's fourth and fifth albums and all rights in SNP's first three albums and assumed the responsibility of paying out any royalties that would later come due on the sales of those three prior SNP releases. Although the production contract between NITA and SNP called for SNP's share of the royalties to be paid directly to SNP, London declined to pay royalties directly to SNP, thus necessitating an alternate arrangement. An agreement between NITA and SNP, memorialized in a June 23, 1993 letter (trust agreement), provided that all record royalties payable by London be paid to a separate trust account to be established in NITA's name but under the control of a third-party "joint venturer" of NITA, who was acting as SNP's manager at the time.

Subsequently, on March 9, 1995, after London's release of

---

**1.** The judgment reflects that the parties had agreed during trial that the legal name of third-party defendant Cheryl James is Cheryl Wray and that any judgment entered shall be in the latter name.

SNP's fourth album, the group's biggest success, SNP, through a newly formed production company, signed a contract with MCA Records to record four albums after the release of their fifth album by London. Later that same year, by separate agreement, London agreed to assign its right to create and distribute SNP's fifth album to MCA, thereby making the fifth and last album covered by the London contract the first album covered by the MCA contract. Since NITA was not a party to the MCA contract or London's assignment of its remaining rights to MCA, an arrangement had to be made with NITA with respect to the fifth SNP album. On April 15, 1997 SNP and NITA entered into a settlement agreement that is at the heart of this appeal. Under this agreement, NITA gave up its rights to produce the fifth SNP album and consented to London's assignment of that album to MCA. In exchange, SNP paid a $2 million advance to NITA of its share of royalties to be earned on sales of all SNP records, $1 million of which was paid upon execution of the settlement agreement. The $1 million balance was to be paid when the fifth album was released. NITA further agreed that the $2 million advance would be recoupable in full. The agreement gave SNP the right to recover $1.6 million of the $2 million advance from NITA's share of the record royalties earned on the sales of the first five SNP albums. The remaining $400,000 was recoupable only from merchandising income generated through use of the SNP name. The settlement agreement specifically provided that NITA would still receive a one-third share of royalty income from the fifth SNP album even if it did no work to create it. Future royalties payable by MCA on sales of the fifth album were to be subject to the trust agreement. In December 1997, NITA was dissolved, shortly after it received the second $1 million.

After the settlement agreement was signed, record royalties continued to be earned on the first four SNP albums, all of which should have been paid to SNP until $1.6 million of the $2 million advance had been recouped. The first of the two disputes at issue occurred in 1998 when the third-party trust administrator noted that $500,000, as paid by MCA under its new name, UMG, to SNP as an advance for the recording of two new songs, had been charged against NITA's royalty account. When NITA complained, UMG refused to reverse the charge since it was applied against record royalties that belonged to SNP until $1.6 million of its advance to NITA has been repaid. By early 2000 UMG had recouped this $500,000 advance from the royalties accruing on the sales of the first four SNP albums and additional royalties were now available for disbursement. In this lawsuit, in addition to the recovery of royalties, NITA seeks also to re-

verse the $500,000 charge. Pursuant to a stipulation and court order, UMG deposited into court $455,058.05 in record royalties that are in dispute between NITA and SNP. UMG was required to pay into court all future royalties but has not done so. At trial, the parties agreed that $85,649.12 in record royalties had been accumulated by UMG since the February 20, 2003 stipulation and order and the time of trial, bringing the total of disputed, earned royalties to the sum of $540,707.17. UMG and the other defendant record companies were dismissed from the action, leaving only NITA and SNP as parties hereto. NITA thereupon amended its complaint to assert claims directly against SNP for breach of contract, unjust enrichment, tortious interference with contract and for attorneys' fees. Two of these claims, for tortious interference with contract and attorneys' fees, were withdrawn during trial, leaving only the claims for breach of contract and unjust enrichment for resolution.

In its charge, as to which no issue is raised, the trial court instructed the jury that NITA sought to recover on its breach of contract claim $1,040,707.17, consisting of (1) $500,000 in royalties that NITA never received because of the advance made by UMG to SNP that was purportedly improperly charged to NITA's royalty account; and (2) $540,707.17 in disputed royalties being held by the Clerk of the Supreme Court and UMG. With two of the four elements required to establish a breach of contract claim not being disputed, i.e., the formation of a valid contract and performance by NITA, the court, without objection, instructed the jury as follows: "Thus, the issues you must decide and resolve in NITA's breach of contract claim are whether M[r]s. Wray and Ms. Denton breached their contractual obligations in the manner alleged by NITA and whether NITA suffered any damages as a result." The verdict sheet listed both elements separately, asking the jury, first, to consider whether the settlement agreement or the trust agreement letter had been breached and, second, whether NITA suffered any damage as a result. The jury determined that there had been a breach, unspecified, of one or both of these agreements but that NITA suffered no damage, including the $540,707.17 at issue on appeal.[2] NITA's motion to set aside the verdict was denied. Both sides thereafter submitted proposed orders. Notwithstanding the jury's verdict refusing to award the $540,707.17 in disputed royalties to NITA, the court inexplicably signed NITA's proposed order directing, inter alia, the entry of judgment in NITA's favor and the payment to it of the sum of $540,707.17. It also

---

2. The jury found SNP not liable on NITA's unjust enrichment claim. No cross appeal has been taken from this aspect of the verdict.

directed that all future royalties on the sale of SNP records be paid to NITA and "distributed strictly in accordance with the terms and provisions" of the settlement and trust agreements, which are "in full force and effect." We reverse.

The order on appeal is not only inconsistent with, but directly contrary to, the verdict and contrary to the trial evidence, which clearly showed that all royalties from sales of SNP records are payable to SNP until the $1.6 million advance against NITA's share of those royalties is recouped. Moreover, the order conflicts with the law of New York in that it grants NITA, a dissolved corporation, as a "Trustee" for SNP, the right, indefinitely, to receive royalties that NITA concedes belong, in substantial part, to SNP.

The trial court charged, without objection, that NITA's breach of contract claim had two components:

"First, NITA argues that [Salt 'N Pepa] breached their contractual agreements with NITA by arranging for an advance of $500,000 paid to them in September 1997 to be charged against NITA's royalty account with London Records or with the record company.

"Second, NITA argues that [Salt 'N Pepa] breached these same agreements by instructing the record company to withhold payment from NITA of all record royalties accrued on sales of Salt 'N Pepa records since 2000, an amount that now totals $54[0],707.1[7]."

This characterization of NITA's claim was consistent with the theory presented at trial by its trial counsel. The court also correctly summarized SNP's defense to this claim, stating that it did not arrange for the $500,000 charge to NITA's royalty account and that under the April 15, 1997 settlement agreement all royalties from SNP's records belong to SNP until its advance of $1.6 million in royalties paid to NITA is recouped. The court's charge as to the elements of a breach of contract cause of action was taken from PJI 4:1 and is consistent with judicial precedent (*see e.g. Furia v Furia*, 116 AD2d 694 [1986]; *see also Alpha Auto Brokers v Continental Ins. Co.*, 286 AD2d 309, 310 [2001]). "The jury is, of course, presumed to have followed the court's instructions" that damage was an essential element of NITA's claim for breach of contract (*Peters v Port Auth. Trans-Hudson Corp.*, 234 AD2d 205, 207 [1996], *lv denied* 90 NY2d 802 [1997]). The provisions of the order on appeal directing payment of $540,707.17 cannot be reconciled with the verdict or jury charge. In concluding that despite the breach of contract NITA was not entitled to recover any damages, the jury necessarily accepted SNP's defense that all of the damages sought by NITA on this

claim had already been paid in the form of a $1.6 million advance, and that therefore the amount sought rightfully belonged to SNP, a conclusion overwhelmingly supported by the evidence. Contrary to NITA's argument, SNP's advance against NITA's share of royalties could be recouped from the sales of all SNP albums, including the first four, not just the fifth.

Finally, the order on appeal grants NITA the right to collect record royalties not only for itself, but for SNP for as long as SNP records are sold. This was error. It is one thing for the court to have concluded that NITA's dissolution did not preclude it from pursuing a claim against SNP for its own share of record royalties on a "winding up" theory (see Business Corporation Law § 1005 [a] [2]). It is quite another to grant to a dissolved corporation the indefinite right to receive and administer record royalties that, in large part, belong to SNP. This activity, authorized by the trial court, is unrelated to the winding up of NITA's business. Concur—Nardelli, J.P., Saxe, Sullivan, Marlow and Catterson, JJ.