OPINION OF THE COURT
Feinman, J.
In 2010, VisionChina Media, Inc. (VisionChina) and its wholly owned subsidiary Vision Best Limited (collectively, the buyers) acquired their then competitor, nonparty Digital Media Group Company Limited (DMG), from that company’s shareholders and/or officers (the sellers). VisionChina is one of the largest out-of-home digital mobile television advertising networks in the People’s Republic of China (PRC). It uses digital mobile technology to deliver advertising content to displays on public transportation systems across that country. DMG operated a digital media advertising network, and sold advertisements on a network of television screens across public transportation systems throughout the PRC.
Merger negotiations first commenced in 2008, but were unsuccessful because the buyers believed DMG, which had never turned a profit, was overpriced. They recommenced in the summer of 2009 when the buyers received oral representations that DMG had significantly improved its financial condition. On September 26, 2009, the buyers entered into a letter of intent to purchase, with the closing to occur on October 15, 2009, subject to a 21-day due diligence period. During due diligence, the buyers were provided with DMG’s audited financial statements for the years 2006 through 2008. They were also given unaudited financial statements for January 1, 2009 to August 31, 2009 (the management accounts). The audited statements confirmed that DMG had never made a profit, and the management accounts bore out the sellers’ representations that in 2009 there was increasing net income and decreasing losses. The buyers were also told that by September DMG had met or exceeded its costs, and that this upward trend would continue into the fourth quarter, the industry’s peak season.
*53 The management accounts and the oral representations were allegedly material in the buyers’ decision to acquire DMG. The parties entered into an agreement on October 15, 2009, when they were provided with the unofficial September 2009 figures showing greater net revenues than expenses. The closing date was November 16, 2009; on this date the parties signed an amended and restated agreement and plan of merger, wherein on January 2, 2010 (the effective time), DMG would be merged into one buyer’s wholly owned subsidiary, and the buyers would acquire all of DMG’s assets, including all electronically stored data. The buyers could terminate the agreement prior to the effective time if “any of the representations and warranties of the [sellers] herein become untrue or inaccurate.”
The buyers covenanted that on the closing date, they would deposit $29,350,000 and shares into escrow as the “Effective Time Escrow Amount,” which would be released at the effective time. They further covenanted that at the effective time, they would issue and deliver to the sellers $100 million as initial consideration, consisting of cash and shares, and that on the next two anniversaries of the closing date, two deferred payments of another $30 million each comprised of cash and shares would be delivered. Of the initial consideration, the buyers would deposit nearly $50 million and shares into three separate escrow accounts, including an indemnity escrow fund, and a segregated expense fund. Any amounts not subject to indemnity obligations would be disbursed to the shareholders after the first anniversary date.
The sellers warranted that both the audited financial statements and the management accounts were “true and complete” and prepared in accordance with industry standards (GAAP). Between the closing date and the effective time, sellers covenanted not to “transfer or dispose of . . . any property, rights, businesses or assets (including Intellectual Property).” They would make reasonable efforts to provide a report by the accounting firm of Ernst & Young (E&Y report) concerning the management accounts by December 31, 2009. In the event they did not, the buyers could retain $2 million in the indemnity escrow fund until receipt of the E&Y report.
The sellers would indemnify the buyers for any losses arising from their representations and warranties, upon a “claim notice” made by the buyers no later than November 16, 2010. This was the buyers’ sole remedy after the January 2, 2010 effective date. The maximum shareholder liability for claims of *54 breach of contract and fraud would be based on the number of shares held.
According to the sellers’ complaint and the buyers’ corresponding answer with defenses and counterclaims, the buyers timely funded the various escrow accounts, and at the effective time the buyers authorized the release of $100 million in initial consideration. The E&Y report was provided to the buyers a week early, nine days before the effective time. The E&Y report showed that DMG’s revenue for the first eight months of 2009 was considerably lower, and its losses considerably higher, than the sellers had orally represented and as stated in the management accounts, and that DMG was on a downward trend. Nonetheless, the merger was completed on January 2, 2010. No later than April 2010, when the computer servers were physically transferred from the former DMG’s custody to the buyers’ custody, the buyers discovered that the electronic data stored on the former DMG servers had been wiped clean, and were not recoverable.
On November 16, 2010, the buyers served a claim notice that DMG’s accounts receivable and other revenues had been overstated, as revealed in the E&Y report, and that the management accounts had not been prepared, as warranted, in accordance with GAAP They claimed $2,785,633 in losses. No claims of fraud or breach of contract as to the lost data were made. The buyers did not make the first $30 million deferred payment on November 16, 2010, and did not pay the second in 2011.
Notwithstanding the fact that the parties’ principal places of business are in China, as is that of DMG, pursuant to the choice of law and forum selection clauses of the merger agreement, the buyers and the sellers commenced separate lawsuits in New York. The buyers’ complaint alleged four causes of action: fraudulent inducement, breach of contract, unjust enrichment, and a declaration that the sellers were not entitled to any further payments. The sellers’ complaint alleged breach of contract and anticipatory breach of contract among other claims. In the latter action, the buyers’ answer included five counterclaims, four mirroring those in their complaint and another alleging breach of contract based on the missing electronic files.
As the result of several motions and cross motions, and to the extent relevant here, the motion court granted the sellers’ preanswer motion to dismiss the buyers’ complaint except for their breach of contract claim based on the accounts receivable discrepancies, and also the buyers’ identical counterclaims in *55 the sellers’ action. The sellers were denied summary judgment on their complaint’s first two causes of action alleging breach of contract for the buyers’ failure to pay the two deferred payments in 2010 and 2011. They were granted two orders of at-
tachment, totaling $60 million; the orders were subsequently confirmed. The buyers’ fifth counterclaim in the sellers’ action, for breach of contract based on failure to turn over the electronic data, was dismissed as time-barred but later reinstated under the doctrine of equitable recoupment as an affirmative defense to the sellers’ claims of breach of contract. The buyers’ cross motion to vacate or modify the previous orders, or for a hearing on the amount of the undertaking, was denied, although the court sua sponte directed the sellers to deposit $500,000 in addition to the $500,000 undertaking they initially posted. The buyers were directed by order entered about August 13, 2012 to transfer $60 million in U.S. currency or “readily convertible” currency, by August 21, 2012, into the ultimate care of the New York City Sheriffs office, or to “provide such other security as [the sellers] may consent to in writing.”
These appeals and cross appeals followed. We agree with the motion court that, except for the buyers’ breach of contract claim based on the accounts receivable discrepancies, the buyers’ complaint should be dismissed, as should the buyers’ counterclaims premised on the same theories in the sellers’ action. We reverse the motion court’s orders to the extent they denied the sellers summary judgment on their claims for the deferred payments. In our view, the two attachments were improperly granted and confirmed, and we therefore reverse those orders, as well as the order to compel the transfer of assets.
I. The Buyers’ Litigation
The buyers appeal from the pre-answer dismissal of their claim and counterclaim of fraudulent inducement, which the motion court found both duplicative of their breach of contract claim and insufficiently pleaded (CPLR 3211 [a] [7]), as well as the causes of action and counterclaims alleging unjust enrichment and for a declaratory judgment.
On a motion to dismiss pursuant to CPLR 3211, the court accepts as true the facts as alleged in the complaint and submissions in opposition to the motion, accords the plaintiff the benefit of every possible favorable inference, and determines only whether the facts as alleged fit within any cognizable legal theory (Sokoloff v Harriman Estates Dev. Corp., 96 NY2d 409, 414 *56 [2001]). “Dismissal pursuant to CPLR 3211 (a) (1) is warranted only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law” (Ladenburg Thalmann & Co. v Tim’s Amusements, 275 AD2d 243, 246 [1st Dept 2000]).
As noted above, the buyers did not give timely notice of their claim of fraudulent inducement. Under the agreement, providing notice to the sellers within one year of the closing date was the exclusive post-closing remedy. Although the buyers offer several reasons why the contractual one-year limitation period should be ignored and their fraud claim permitted to proceed, none are persuasive. Most particularly, they argue that under Towers Realty Corp. v Fox (278 App Div 74 [1st Dept 1951]), because they partially performed by setting aside monies and shares in escrow, and did not receive the E&Y report revealing the allegedly fraudulent misstatements until several weeks later, their continued performance in allowing the merger to proceed at the effective time did not waive any claim of fraud.
It is well established that a contract induced by fraudulent representation is voidable, and that the defrauded party has several remedies.
“On discovery of the fraud . . . : (1) He [or she] may rescind the contract by promptly tendering back all that he [or she] has received under it. He [or she] may then bring an action at law upon the rescission to recover back what he [or she] has paid, or (2) defend an action brought against him [or her] on the contract, setting forth the fraud and rescission as a defense. (3) He [or she] may bring an action in equity for rescission .... These remedies are based upon a disaffirmance of the contract, in which the party rescinding or desiring to rescind in effect says, you have induced me to enter into this contract by fraud. I offer you what I received. Give me back that which you received, or if that be impossible pay me its value. (4) He [or she] may affirm the contract and sue for his [or her] damages. (5) If sued upon the contract, he [or she] may counterclaim his [or her] damages.” (Wood v Dudley, 188 App Div 136, 140 [1st Dept 1919] [citation omitted].)
The defrauded party may not, however, affirm the transaction by continuing to perform, keep the property and also recover *57 the costs of acquiring and maintaining it (Clearview Concrete Prods. Corp. v S. Charles Gherardi, Inc., 88 AD2d 461, 466 [2d Dept 1982]).
In Towers Realty, Clearview Concrete, and indeed any claim alleging fraud, the plaintiff must always sufficiently allege the elements of fraud, prior to analysis by the court as to whether the plaintiff’s conduct had waived the fraud and if not, the proper method of calculating damages. Here, the motion court properly found that the buyers failed to sufficiently allege a claim of fraud.
The elements of fraud are a misrepresentation or a material omission of fact which was known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or omission, and injury (see Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178 [2011]). In this case, the buyers have not sufficiently alleged justifiable reliance.
“[R]eliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud” (Danann Realty Corp. v Harris, 5 NY2d 317, 322 [1959]). What constitutes reasonable reliance is “always nettlesome” because it is so fact-intensive (DDJ Mgt., LLC v Rhone Group L.L.C., 15 NY3d 147, 155 [2010] [internal quotation marks omitted]). Sophisticated investors must show they used due diligence and took affirmative steps to protect themselves from misrepresentations by employing what means of verification were available at the time (see e.g. HSH Nordbank AG v UBS AG, 95 AD3d 185, 194-195 [1st Dept 2012]).
The Court of Appeals has held that in contract negotiations between sophisticated entities, the justifiable reliance prong of a claim of fraud can be sufficiently alleged where the plaintiff “has gone to the trouble” of insisting on a written agreement that includes warranties that certain facts are true (DDJ Mgt., 15 NY3d at 154). Here, the buyers argue that their complaint withstands the test set forth in DDJ Mgt. because the merger agreement contains such warranties and they were therefore justified in relying on those terms without undertaking additional investigation.
However, the buyers’ reliance on DDJ Mgt. is misplaced. First, here the buyers were well aware of DMG’s financial problems in earlier years. Second, the agreement negotiated between the buyers and sellers included, in addition to the warranties referenced by the buyers, the provision that the buyers *58 would receive, prior to the effective time, the E&Y report pertaining to the figures for the first eight months of 2009, and a provision that upon finding any of the representations or warranties to be untrue or inaccurate before the effective date, the buyers could terminate the agreement. Thus, the buyers negotiated terms that would have allowed them to discover the alleged fraud and to cancel the agreement but they then failed to take advantage of these terms. Moreover, the documentary evidence which allegedly reveals the fraud, that is, the E&Y report, was undisputably in the buyers’ possession within the one-year contractually negotiated period for making a claim against the sellers, but the buyers chose not to make a notice of claim. For these reasons, the branch of the sellers’ motion to dismiss the claim and counterclaim alleging fraud was properly decided (CPLR 3211 [a] [7]).
As the claim and counterclaim of fraudulent inducement were properly dismissed, the motion court also correctly dismissed the cause of action and counterclaim seeking a declaration that the buyers are not obligated to pay the remaining consideration. The cause of action and counterclaim sounding in unjust enrichment were also properly dismissed, because a valid contract “generally precludes recovery in quasi contract for events arising out of the same subject matter” (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 23 [2005]). In light of the foregoing, the buyers’ other arguments need not be considered.
II. The Sellers’ Litigation
A. Breach of Contract
Sellers cross-appeal from the denial of partial summary judgment as to their first two causes of action alleging breach of contract based on the buyers’ failure to pay the two deferred payments in 2010 and 2011.
“Summary judgment must be granted if the proponent makes a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact, and the opponent fails to rebut that showing” (Brandy B. v Eden Cent. School Dist., 15 NY3d 297, 302 [2010] [internal quotation marks omitted]).
To state a claim for breach of contract, a plaintiff must allege: (1) the parties entered into a valid agreement, (2) plaintiff performed, (3) defendant failed to perform, and (4) damages (see Noise In The Attic Prods., Inc. v London Records, 10 AD3d 303, 307 [1st Dept 2004]).
*59 The motion court correctly concluded that the sellers had established their breach of contract claims, but erred in holding that summary judgment was not appropriate because of the buyers’ affirmative defense pertaining to the missing electronic data. Article 4 of the merger agreement provides that the sellers were to remain responsible for the electronic data and other DMG property between the closing date of November 16, 2009 and the effective time of January 2, 2010. The averments by VisionChina’s director of information technology, Jun Liu, are that after the effective time, he had access to the former DMG servers and at that time, “all seemed in order.” As Liu establishes that the data existed as of the January 2, 2010 merger date, the buyers have no affirmative defense to the breach of contract claims, and the sellers should be granted summary judgment. Accordingly, the branch of the June 15, 2012 order which denied sellers’ motion for summary judgment as to their first and second causes of action based on the buyers’ failure to pay the two deferred considerations and which reinstated the buyers’ previously dismissed fifth counterclaim as an affirmative defense to these claims should be reversed.
B. Attachment
The remainder of the issues on appeal in the sellers’ litigation are raised by the buyers, who seek vacatur of the orders of attachment.
An order of attachment directs the sheriff to take constructive and sometimes actual hold of a defendant’s property, so that it can be applied to the plaintiffs judgment in the action, should the plaintiff prevail (Siegel, NY Prac § 313 at 499 [4th ed 2005]; CPLR art 62). The plaintiff must show a viable cause of action and the probability that it will succeed on the merits, that one or more grounds exist for attachment as set forth in CPLR 6201, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff (CPLR 6212; see Considar; Inc. v Redi Corp. Establishment, 238 AD2d 111 [1st Dept 1997]).
Attachment is a “harsh” remedy, and is construed narrowly in favor of the party against whom the remedy is invoked (Penoyar v Kelsey, 150 NY 77, 80 [1896]; DLJ Mtge. Capital, Inc. v Kontogiannis, 594 F Supp 2d 308, 319 [ED NY 2009]). Whether to grant a motion for an order of attachment rests within the discretion of the court (see Morgenthau v Avion Resources Ltd., 11 NY3d 383, 387 [2008] [no abuse of discretion when court declined to confirm the attachment orders]). Here, *60 the motion court found that the sellers met the statutory standards to be awarded an attachment, and that the ground for attachment was based on the buyers being “foreign corporation^] not qualified to do business in the state” (CPLR 6201 [1]; 6212 [a]).
In addition to establishing that a defendant subject to the court’s personal jurisdiction meets the statutory requirements for an attachment, the party seeking attachment must demonstrate an identifiable risk that the defendant will not be able to satisfy the judgment (Hotel 71 Mezz Lender LLC v Falor, 14 NY3d 303, 310-311 [2010]; Koehler v Bank of Bermuda Ltd., 12 NY3d 533, 538 [2009]). The risk should be real, “whether it is a defendant’s financial position or past and present conduct” (Ames v Clifford, 863 F Supp 175, 177 [SD NY 1994]; see also General Textile Print. & Processing Corp. v Expromtorg Intl. Corp., 862 F Supp 1070, 1073 [SD NY 1994]). The court may consider the defendant’s history of paying creditors (see Habitations Ltd. v BKL Realty Sales Corp., 160 AD2d 423, 424 [1st Dept 1990]), or a defendant’s stated or indicated intent to dispose of assets (see County Natwest Sec. Corp., USA v Jesup, Josephthal & Co., 180 AD2d 468, 469 [1st Dept 1992]).
Here, the motion court cited ITC Entertainment, Ltd. v Nelson Film Partners (714 F2d 217, 220 [2d Cir 1983]), and reasoned that “New York courts have long recognized that provisions for attachment against nonresidents are based on the assumption that there is much more propriety in requiring a debtor, whose domicile is without the state, to give security for the debt, than one whose domicile is within” (2011 NY Slip Op 33689[U], *21-22 [internal quotation marks omitted]). The motion court was further persuaded that attachment was needed based on statements made in the buyers’ SEC filings that (1) “our PRC counsel has advised us that the PRC does not have treaties with the United States or many other countries providing for the reciprocal recognition and enforcement of legal judgments”; (2) it “may also be difficult ... to enforce in U.S. courts judgments obtained in U.S. courts,” and (3) “substantially all of our assets are located outside of the United States.” The court concluded that “an eventual ruling in the [sellers’ favor may . . . prove to be worthless in the absence of a prejudgment order of attachment” (id. at *22).
In our view, the ITC decision relied on by the motion court is very different factually from the case at bar, and not on point. The ITC defendants, who were not domiciled within New York, *61 did not have sufficient assets to satisfy a $2.7 million judgment, the defendants’ general partner was “soon” to receive “highly liquid assets” that might be invested in a manner that “would make enforcement of ITC’s judgment difficult,” and the general partner had “conducted business in a less than exemplary manner” (714 F2d at 219 [internal quotation marks omitted]). In contrast, here there is no evidence that the buyers lack sufficient assets if a judgment is rendered against them. Nor is there evidence that the buyers have hidden or will choose to hide or otherwise dispose of their assets.
There must be more than a showing that the attachment would, in essence, be “helpful” (Founders Ins. Co. Ltd. v Everest Natl. Ins. Co., 41 AD3d 350, 351 [1st Dept 2007]). Here, while it may be true that many foreign parties “experience difficulties when dealing with” the PRC’s State Administration of Foreign Exchange (S.A.F.E.), the entity that ultimately approves the conversion of Renminbi (PRC’s currency) into foreign currency for remittance out of China, there is nothing in the record showing that S.A.F.E., if applied to, would deny approval to the buyers to pay $60 million.
An attachment is “frequently used when the creditor suspects that the debtor is secreting property or removing it from New York” (Koehler v Bank of Bermuda Ltd., 12 NY3d at 538). In Elton Leather Corp. v First Gen. Resources Co. (138 AD2d 132 [1st Dept 1988]), attachment was appropriate where it was uncontested that the defendants had received but not paid for the goods, and there was proof that they were in financial trouble and were poised to move to dismiss the complaint on jurisdictional grounds. In contrast, in Sylmark Holdings Ltd. v Silicone Zone Intl. Ltd. (5 Misc 3d 285 [Sup Ct, NY County 2004]) involving nondomiciliary Hong Kong based defendants not qualified to do business in New York State, the court found no need for an attachment of assets because the plaintiffs had failed to demonstrate “a real identifiable risk that the defendants will be unable to satisfy any judgment obtained by plaintiffs,” for instance that the defendants “would conceal or convert any of their assets were it not for an attachment order, or that they would be unlikely to satisfy the potential judgment” (id. at 301).
We conclude that, on the extant record which consists of competing affidavits, the grant of an attachment and its confirmation was an abuse of discretion. “[T]he mere fact that defendant is a non-domiciliary residing without the State of *62 New York is not sufficient ground for granting an attachment” (TAGC Mgt, LLC v Lehman, 842 F Supp 2d 575, 586 [SD NY 2012] [internal quotation marks omitted]). The sellers have shown no evidence that the buyers lack sufficient assets, or that they will choose to hide or otherwise dispose of their assets. We note that no hearing was held at which the credibility of the buyers’ averments regarding their financial status and resources could be evaluated. At most, the sellers’ affidavits establish that there is potentially a significant amount of bureaucracy involved in obtaining the assets as converted funds. This is not, in itself, sufficient to order an attachment. The orders of the motion court granting and confirming the orders of attachment, and granting discovery to aid in attachment, as well as the order that the buyers transfer assets into New York State, should therefore be reversed.
Finally, the buyers’ remaining arguments concerning violation of the act of state doctrine and principles of comity are rendered academic, but if we were to consider them, we would find them unpersuasive.
Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered November 3, 2011, which, to the extent appealed from, granted defendants’ motion to dismiss the first, third, and fourth causes of action in VisionChina Media Inc. v Shareholder Representative Servs., LLC, and granted plaintiffs’ motion to dismiss the first, third, fourth, and fifth counterclaims in Shareholder Representative Servs., LLC v VisionChina Media Inc. pursuant to CPLR 3211, should be affirmed, without costs. The order of the same court and Justice, entered November 4, 2011, which, in Shareholder, granted plaintiffs’ motion to attach defendants’ assets, should be reversed, on the law and the facts, with costs, and the motion denied. The order of the same court and Justice, entered June 15, 2012, which, to the extent appealed from as limited by the briefs, granted the Shareholder plaintiffs’ motion to confirm two ex parte orders of attachment and denied their motion for partial summary judgment on their first and second causes of action and reinstated the previously dismissed fifth counterclaim as an affirmative defense, should be reversed, on the law and the facts, with costs, the motion to confirm denied and the motion for summary judgment granted. The order of the same court and Justice, entered on or about August 13, 2012, which granted the Shareholder plaintiffs’ motion to compel defendants to transfer $60 million into New York and to extend the time *63 period to perfect their levies, should be reversed, on the law and facts, with costs, and the motion denied.
Friedman, J.E, DeGrasse and Richter, JJ., concur.
Order, Supreme Court, New York County, entered November 3, 2011, affirmed, without costs. Order, same court, entered November 4, 2011, reversed, on the law and the facts, with costs, and the motion denied. Order, same court, entered June 15, 2012, reversed, on the law and the facts, with costs, the motion to confirm denied and the motion for summary judgment granted. Order, same court, entered on or about August 13,
2012, reversed, on the law and the facts, with costs, and the motion denied.