Charles A. Loreto, J.
Upon an application of the defendant to dismiss the complaint (Bules Civ. Prac., rule 107, subd. 7), on the ground that the alleged contract on which the cause of action is founded is unenforcible under the provisions of the Statute of Frauds (Personal Property Law, § 31, subd. 10), the court made an order of reference to a Special Referee. The plaintiff moves for confirmation of the Referee’s report, and for a denial of the motion to dismiss the complaint.
The complaint is based upon an express oral contract entered into by plaintiff with defendant, as executor of the estate of Marjorie Nott Morawetz, deceased, for services rendered by the plaintiff in procuring a purchaser of a “ working interest in twenty-seven (27) oil wells located in the states of Louisiana and Mississippi The plaintiff alleges that the parties are residents of New York and the agreement was made in the State.
The oral agreement having been made by residents of this State, and within the State, the applicable substantive law to be applied is the law of New York (Bitterman v. Schulman, 265 App. Div. 486, affd. 293 N. Y. 678).
Subdivision 10 of section 31 of the Personal Property Law provides in substance that an agreement not in writing is void if it “ Is a contract to pay compensation for services rendered in negotiating * * * the purchase, sale, exchange * * * of a business opportunity, business * * * or an interest therein ’ ’.
The question presented is whether the “ working interest ” in the oil wells is “ a business opportunity” and within the meaning of the statute. The testatrix’s holdings consisted of an 8/128th interest in, and to the rights under, an oil lease pro *547 viding for the “ drilling and mining for and producing oil, gas and all other minerals ” in 27 oil wells situated on five separate tracts of land which formed part of an oil field known as the Rodney Island Unit. In 1957, her estate and other owners of working interests in oil wells in the Rodney Island Unit combined their interests and entered into a “ Unit Operating Agreement This agreement was made “ to promote the conservation and increase the ultimate recovery of oil, gas and associated minerals from the Rodney Island Field ”. Thus the original rights of the Morawetz estate in the 27 oil wells situated on five tracts of land were merged with other similar tracts of oil land to make a unitized operation of a producing oil field. The result of such merger under the Unit Operating Agreement gave the Morawetz estate a working interest of .01146714 in the entire Rodney Island Field.
The Referee has thoroughly and painstakingly set forth in detail the material and relevant terms of the operating agreement from which he found that the unit operator had the exclusive right to develop and operate the unit area for the ultimate recovery and production of oil, gas and associated minerals. And he states that in view of the small interest of the Morawetz estate in the entire working unit, it is highly improbable that it would be in a position to exercise any managerial powers conferred by the agreement. He concludes that the estate’s working interest is not “ a business opportunity ”, “a business or interest therein ” within the meaning of the statute.
Subdivision 10 of the statute was enacted to help eliminate the evils and dangers resulting from claims for compensation based on alleged oral agreements. The Law Revision Commission, in its recommendation to the Legislature for its enactment, stated:
“In recent years there havé been a substantial number of reported cases of claims for commissions for services rendered in the sale of a going business or a business opportunity. Under existing law there is no requirement that business brokers’ contracts for commissions be in writing. The nature of the transactions is such that, in the absence of the requirement of a writing, unfounded and multiple claims for commissions are frequently asserted, and employers often seek to escape liability by denying the fact of employment. These controversies are commonly resolved by juries on conflicting testimony, with the consequent danger of erroneous verdicts. * * *
“ The Commission believes that the Statute of Frauds, section 31 of the Personal Property Law, should be made applicable to contracts for compensation for services rendered in the sale of *548 a business opportunity, business, or interest therein.” (N. Y. Legis. Doc., 1949, No. 65 [G-], p. 615; italics supplied.)
It is a rule of statutory construction that the legislative intent “is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the objects and the remedy in view” (1 Kent’s Comm. 462). Courts must ‘1 read the statute in the light of the state of facts which were found by the Legislature, and which prompted the enactment ’ ’ (St. Nicholas Cathedral v. Kidroff, 302 N. Y. 1, 31). Interpretation of words, sentences and phrases contained in a statute must not be made without reference to the scheme of the whole (Matter of General Reinsurance Corp. v. Pink, 269 N. Y. 347).
There are veritably almost countless decisions that have passed upon the definition or interpretation of the word “ business ”. That excellent treatise Corpus Juris covers the term “business” exhaustively (12 C. J. S., Business, pp. 761-809). Neither within the sweep of the New York court decisions nor within the reading of the words of the statute, does the court find that the defendant’s interest in the venture constitutes a “ business ” or a “ business interest ”.
Therefore, what is involved in this case is a determination of the question whether the facts present “ a business opportunity ” as intended by the act. In vain the court has researched for any prior court decision giving its definition of the term ‘1 a business opportunity ”. Nor have counsel for the parties been able to cite a reported ease with analogous facts. It appears that this case presents an issue of first impression.
Although the defendant had a fractional interest in the oil, gas and mineral leases situated in five separate tracts of land in the two named States and the law of those States declares such an interest or right to be real property, the law of the foreign forum is inapplicable to this case and reference to it is futile, for this cause is predicated upon an alleged agreement made in this State for services rendered in connection with such a lease interest.
If the defendant was the owner only of a mineral leasehold interest and offered that for sale, it could well be interpreted as something in the nature of an investment and probably considered somewhat similar to the interest of a stockholder or bondholder in a corporation, as is contended by plaintiff’s attorney.
However, the defendant’s mineral leasehold interest was tied to an operator’s contract and this is what the plaintiff alleges the defendant offered for sale. The operator’s contract conferred rights and imposed responsibilities or duties upon the *549 defendant. Therefore, it is essential to consider what those rights and duties are in order to determine whether what the defendant offered for sale was something in the nature of an investment or something more or different.
It is true that the defendant possessed a small fractional interest in the mineral leases — l/128th percentage of the total. Together with the remaining fractional interest holders the defendant entered into the so-called Unit Operating Agreement wherein they are designated as working interest owners and the operator is designated as the unit operator, who undertook to develop and operate the so-called unit area for the production of “ unitized substances ”, i.e., oil, gas and other minerals.
It will be helpful to examine some provisions of the agreement which states the rights and duties of the parties. Thus:
“ ARTICLE 3 SUPERVISION OP OPERATIONS BY WORKING INTEREST OWNERS
“ 3.1. Overall Supervision. Working Interest Owners shall exercise overall supervision and control of all matters pertaining to the Unit Area pursuant to this agreement and the Unit Agreement. In the exercise of such power each Working Interest Owner shall act solely in its own behalf in the capacity of an individual owner-and not on behalf of the owners as an entirety.
‘ ‘ 3.2 Particular Powers and Duties. The matters to be passed upon and decided by Working Interest Owners shall include, but not be limited to, the following :
“3.2.1 Method of Operation. The kind, character and method of operation, including any type of pressure maintenance or secondary recovery program to be employed.
“ 3.2.2 Drilling of Wells. The drilling of any well within the Unit Area either for production of Unitized Substances, for use as an injection well, or for other purposes.
“ 3.2.3 Well Workovers and Change of Status. The work-over, recompletion, repair, abandonment, or change of status of any well in the Unit Area or use of any such well for injection or other purposes.
“ 3.2.4 Expenditures. Making of any single expenditure in excess of Seven Thousand Five Hundred and Ho/100 ($7,500) Dollars; provided that approval by Working Interest Owners of the drilling, reworking, drilling deeper or plugging back of any well shall include approval of all necessary expenditures required therefor and for completing, testing and equipping the same, including necessary flow lines, separators and lease tankage.
*550 ‘ ‘ 3.2.5 Disposition of Surplus Facilities. Selling or otherwise disposing of any major item of surplus material or equipment, the current list price of new equipment similar thereto being Twenty Five Hundred and No/100 ($2,500.00) Dollars or more.
‘ ‘ 3.2.6 Appearance before a Court or Regulatory Body. The designating of a representative to appear before any court or regulatory body in matters pertaining to unit operations; provided however, that the authorization by Working Interest Owners of the designation of any such representatives shall not prevent any Working Interest Owner from appearing in person or from designating another representative in its own behalf. ’ ’
‘ ‘ ARTICLE 4 MANNER OP EXERCISING SUPERVISION
# * #
“ 4.3.2 Vote Required — Generally. Except as may otherwise be provided herein or in the Unit Agreement, Working Interest Owners shall act upon and determine all matters coming before them by the affirmative vote of sixty-five percent (65%) or more voting interest, provided, that should any one Working Interest Owner own more than sixty-five percent (65%) voting interest, its vote must be supported by the vote of three (3) or more Working Interest Owners having a combined voting interest of at least five percent (5%).”
1 ‘ ARTICLE 7 POWERS AND DUTIES OP UNIT OPERATOR
“ 7.1 Exclusive Right to Operate Unit. Subject to the provisions of this agreement and to the orders, directions and limitations rightfully given or imposed by Working Interest Owners, Unit Operator shall have the exclusive right and be obligated to develop and operate the Unit Area for the production of Unitized Substances.”
‘ ‘ ARTICLE 15 LIABILITY, CLAIMS AND SUITS
“15.1 Individual Liability. The duties, obligations and liabilities of Working Interest Owners shall be several and not joint or collective; and nothing contained herein shall ever be construed as creating a partnership of any kind, joint venture, or an association or trust between or among Working Interest Owners.”
‘ ‘ ARTICLE 19 ABANDONMENT OP WELLS
“ 19.1 Rights of Former Owners. If Working Interest Owners decide to permanently abandon any well within the Unit Area prior to termination of the Unit Agreement, Unit Operator shall give written notice of such fact to the Working Interest *551 Owners of the Tract on which such well is located and said Working Interest Owners shall have the right and option for a period of ninety (90) days after receipt of such notice to notify Unit Operator of their election to take over and own said well and to deepen or plug back said well to a formation other than the Unitized Formation.”
‘1 ARTICLE 21 ABANDONMENT OE OPERATIONS
‘ ‘ 21.1 Termination. Upon termination of the Unit Agreement, the following will occur:
‘ ‘ 21.1.1 Oil and Gas Rights. Possession of all Oil and Gas Rights in and to the several separate Tracts shall revert to the Working Interest Owners thereof.
“ 21.1.2 Right to Operate. Working Interest Owners of any such Tract desiring to take over and continue to operate a well or wells located thereon may do so by paying Unit Operator, for the credit of the joint account, the net salvage value of the casing and equipment in and on the well and by agreeing to properly plug the well at such time as it is abandoned.”
The court is satisfied that from a mere reading of the quoted provisions of the operating contract, substantial rights and powers of supervision and control of the operations reside in the working interest owners, including the defendant.
However, the plaintiff’s attorneys contend that the defendant’s interest in the mineral lease is similar to that of a small stockholder in a corporation and that it is in fact so slight that it carries with it no control whatsoever over the operations provided for in the agreement. So the Referee has concluded.
Also they argue that, since the New York statute first sets forth the general term “ business ” which is followed by a statement that the said term shall include “ a majority of the voting stock interest in a corporation ” and the “ creating of a partnership ”, that these specific situations indicate the limit of the extent to which the Legislature intended to broaden or expand the business concept wherein it meant to require a writing to permit a claim for broker’s services.
The court disagrees with these contentions. It should be noted that the agreement disclaims a partnership arrangement. This stipulation is of no legal consequence in this suit. The status of a fractional interest owner such as the defendant, no matter how small, in the court’s opinion is clearly distinguishable from that of a minority stockholder of a corporation. The latter exercises no direct control over the corporate business. True, he has a right to participate in the election of directors and to receive dividends, when declared. However, he is not engaged *552 iu a business venture. He is one who has an investment in a business, whereas under this operating agreement the contract provisions quoted declare the right of the fractional interest owner to participate directly in many facets of the operations. That he does not own 65% of the leasehold, which would be required under the agreement for him alone to overrule the unit operator is not the determinative factor. If he had such a percentage of ownership, surely it could not be denied that he would then be one possessing the right and power to exercise practically full control over the operations. But a small, even an insignificant, fractional interest, has a vote, joined with as many additional fractional leasehold owners as would be necessary to total 65%, to accomplish as much in exercising control. The court need not speculate on the probabilities of the small fractional owners uniting in vote to make the needed 65%.
Of significance, too, is the fact that what is contemplated under the operating contract is not the performance of a single act, but the performance of a series of acts. A repetition or continuance of operations for a certain period of time is expected.
It is unnecessary for the court to attempt to state what it may conceive to be an all-inclusive definition for the phrase “ a business opportunity ” as used in the statute. It is sufficient for the court to state that in its opinion the factual situation here presented is one revealing a venture entered into for profit with the right to share in the control of the venture, and therefore concludes that it is “a business opportunity ” within the intendment of the statute.
The motion to confirm the Referee’s report is denied, and the original motion upon which decision was reserved to dismiss the complaint because it is barred by the Statute of Frauds, is granted.