**EFiled: Dec 22 2023 08:01AM EST**
**Transaction ID 71680064**
**Case No. 2022-0970-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN C. TATUM III and JCT CAPITAL LLC, | ) | |
| | ) | |
| Plaintiffs and Counterclaim Defendants, | ) ) ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0970-JTL |
| | ) | |
| FAIRSTEAD AFFORDABLE LLC, FCM AFFORDABLE LLC, JD2 AFFORDABLE LLC, STUART FELDMAN, JEFFREY GOLDBERG, FSC EF&F LLC, FAIRSTEAD CAPITAL LLC, FAIRSTEAD CAPITAL MANAGEMENT LLC, JD2 REALTY MANAGEMENT LLC, FA DC LLC, FSC REALTY MANAGEMENT LLC, and SDF FUNDING LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants and Counterclaim Plaintiffs. | ) ) | |

## MEMORANDUM OPINION DENYING MOTION TO DISMISS COUNTS V THROUGH XI

Date Submitted: November 6, 2023
Date Decided: December 22, 2023

Thomas A. Uebler, Adam J. Waskie, Sarah P. Kaboly, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; Rudolf Koch, RICHARDS, LAYTON & FINGER, Wilmington, Delaware; *Counsel for John C. Tatum III and JCT Capital LLC.*

Ryan D. Stottman, Thomas P. Will, Alec Hoeschel, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael B. Carlinsky, Rollo C. Baker, Jonathan E. Feder, Alison Y. Lo, Cohl K. Love, Stephanie Keleman, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Fairstead Affordable LLC, FCM Affordable LLC, JD2 Affordable LLC, Stuart Feldman, Jeffrey Goldberg, FSC EF&F LLC, Fairstead Capital LLC, Fairstead Capital Management LLC, JD2 Realty Management LLC, FA DC LLC, FSC Realty Management LLC, and SDF Funding LLC.*

**LASTER, V.C.**

The plaintiff worked for a real estate investment fund complex. He alleges that the fund principals promised him a share of a promote if he worked on a project for them. He never received the promised payout. He also alleges that the fund principals induced him to transfer an equity interest in another project to one of their entities by promising him that they would restructure the entity to increase his share. The entity was never restructured, and his share never increased. The plaintiff has filed various claims to recover monetary and equitable relief. The defendants moved to dismiss seven of the claims. This decision denies the motion.

## I. FACTUAL BACKGROUND

The facts are drawn from the currently operative complaint and the documents it incorporates by reference. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.[1]

### A. Fairstead's Beginnings

Defendants Stuart Feldman and Jeffrey Goldberg control defendant Fairstead Affordable LLC, a Delaware limited liability company headquartered in New York City. Fairstead Affordable is the central entity in an investment fund complex that operates under the trade name "Fairstead." Feldman and Goldberg own their interests in Fairstead Affordable through defendants FCM Affordable LLC and JD2

---

[1] Citations in the form "Ex. ___" refer to documents attached to the amended complaint.

Affordable LLC.

Plaintiff John C. Tatum III co-founded Fairstead Affordable in 2016 after being recruited by his friend and former colleague, William Blodgett. Tatum signed an employment agreement dated April 26, 2016 with JD2 Affordable LLC. Ex. 4 (the "Employment Agreement"). Shortly thereafter, Goldberg, Feldman, and Tatum negotiated an operating agreement to govern the internal affairs of Fairstead Affordable. Ex. 1 (the "Operating Agreement"). The Operating Agreement incorporated the Employment Agreement by reference and outlined many of Tatum's employment rights, obligations, and interests. Through the Operating Agreement, Tatum's entity, JCT Capital LLC, became a member of Fairstead Affordable with a 5.25% member interest.

FSC EF&F ("EF&F") is an investment vehicle for employees, friends, and family to co-invest in Fairstead assets that are not owned by Fairstead Affordable. Tatum invested in EF&F.

## B.     The Hampstead Portfolio and the New York Portfolio

Before the formation of Fairstead Affordable, Feldman had acquired a majority interest in a separate portfolio of approximately 900 low-income housing units in New York City (the "New York Portfolio"). Fairstead Affordable did not have any ownership interest in the New York Portfolio. Tatum came to hold an indirect ownership interest in the New York Portfolio through his investments in EF&F.

In 2018, various units in the New York Portfolio had failed to pass housing inspections, which could have triggered a default under the financing arrangements that Feldman had used to fund the portfolio. At Goldberg's request, Tatum began

2

working to rehabilitate the New York Portfolio in 2018.

Separately in 2018, Tatum played a role in helping Feldman and Goldberg acquire a portfolio of 1,600 low-income housing units known as the "Hampstead Portfolio." The acquisition was completed through a special purpose entity called FA Acquisitions II. Fairstead Affordable did not have any interest in FA Acquisitions, and Tatum did not receive any interest in the Hampstead Portfolio. Instead, Feldman and Goldberg agreed to give Tatum a share of the carried interest associated with the portfolio, which in the real estate industry is typically called a promote. Tatum also received a loan to invest in the Hampstead Portfolio though EF&F.

## C.     Discussions About A Restructuring

As early as 2018, Tatum, Blodgett, Feldman, and Goldberg discussed restructuring Fairstead Affordable. Tatum and Blodgett wanted a larger equity percentage that would better compensate them for their efforts. Conversations about restructuring Fairstead Affordable continued throughout 2018 and 2019, primarily around year-end performance reviews.

Toward the end of 2019, Tatum and Goldberg signed documents creating their respective interests in the Hampstead Portfolio promote. Tatum's interest was set at 9.096%. In August 2020, as part of the ongoing conversations about the Fairstead Affordable restructuring, Tatum transferred his 9.096% interest in the Hampstead Portfolio promote to Fairstead Affordable. In return, Goldberg and Feldman promised that Tatum would receive a greater interest in Fairstead Affordable through the restructuring. At the time, Tatum owned only a 5.25% interest in Fairstead Affordable, so he would have been exchanging a direct interest in 100% of his share

3

of the Hampstead Portfolio promote for a 5.25% indirect interest in the promote. Without the promised restructuring, that would have been economically irrational.

Later in 2020, Feldman bought out the minority owners of the New York Portfolio. Tatum had worked on the New York Portfolio throughout 2018, 2019, and 2020. Goldberg had promised Tatum on several occasions that he would receive a share of the promote as compensation for his efforts. Tatum asserts that he would never have worked on the New York Portfolio without that promise. A spreadsheet memorializing the final deal model and cash flow waterfall of Feldman's buyout calculated the value of the promote associated with the transaction, assigned Tatum a 5.25% interest in the promote, and valued that interest at approximately $1.1 million. Yet when the buyout closed, Tatum did not receive his share.

**D.    The Restructuring Never Happens.**

Despite various conversations about the Fairstead Affordable restructuring, and despite repeated promises from Goldberg and Feldman, no restructuring took place. In early 2021, Tatum learned that Goldberg had been working to get Feldman to buy out some or all of the interest that Goldberg and his co-investors held in Fairstead Affordable. Tatum told Goldberg that he and Blodgett could try to raise capital to buy those interests.

By May 2021, Tatum had concluded that Goldberg and Feldman would not support either a restructuring or a buyout, so he began preparing for an amicable departure. In August 2021, he created and implemented a written transition plan. He wrote and signed a resignation letter later that month, but he was told that Feldman would fire him for cause if he resigned. Tatum therefore did not formally

resign, but he continued to carry out his transition plan. He communicated regularly with Goldberg about his progress, and he worked with Fairstead's general counsel and chief financial officer on the transition.

By October 2021, Tatum's transition plan was essentially complete. But on October 21, 2021, Fairstead's general counsel wrote to Tatum and purported to accept his resignation without good cause. The letter noted that Tatum had begun to move his 401(k) account to another provider and had sent an email asking for clarification about what Fairstead was saying externally about his employment. Fairstead's general counsel told Tatum that this behavior evidenced his resignation without good cause. The "without good cause" concept had significance under the Operating Agreement, which set out specific resignation procedures.

One procedure applicable to a resignation without good case was a 120-day written notice requirement. After accepting Tatum's resignation as "without good cause," Fairstead invoked that notice provision, meaning that Tatum would breach the operating agreement if he did not stay another 120 days.

Before receiving the letter from Fairstead's general counsel, Tatum understood that he could leave Fairstead after completing his transition plan. No one had indicated that Fairstead would insist on Tatum following the formal resignation process contemplated by the Operating Agreement.

But with Tatum getting ready to leave, Fairstead invoked the formal process and enforced the notice provision. That meant Tatum's employment would not officially end until February 10, 2022. It is reasonable to infer that Fairstead hoped

5

Tatum would start working elsewhere during the notice period, thereby setting up a claim for breach of the Operating Agreement.

Under the Operating Agreement, Tatum's termination caused his 5.25% membership interest to convert into a 5.25% economic interest in specific Fairstead deals. Under the operating agreement, a resignation without good cause meant Tatum was entitled to 100% of his ownership percentage in stabilized deals, but not in other vested deals. The operating agreement defines a "vested deal" as one where the parties have executed a purchase and sale agreement. It defines a "stabilized deal" as a vested deal where the parties have also completed substantial construction, the deal is eligible for permanent financing, and any construction or stabilization guarantees from Fairstead members have been released. By deeming Tatum's resignation to be without good cause, Fairstead restricted Tatum to stabilized deals.

In April 2022, Fairstead Affordable exercised its right under the Operating Agreement to repurchase Tatum's economic interests. The Operating Agreement called for an appraiser to determine the value of the interests.

In June 2022, Fairstead Affordable abruptly changed course and asserted that Tatum had forfeited all of his economic interests. Fairstead Affordable claimed that after Tatum resigned, it learned about misconduct that could support a termination for cause. Fairstead retroactively deemed Tatum to have been terminated for cause and cancelled his interests. Fairstead Affordable also refused to return Tatum's capital contributions.

### E.     This Litigation

Tatum sued on October 26, 2022. He seeks to compel Fairstead Affordable to

6

comply with the repurchase provisions in the Operating Agreement or to recover money damages for breach of those provisions. Tatum also seeks contract and quasi-contract remedies for the defendants' alleged breaches of the agreement governing EF&F, the defendants' breach of their agreement to pay him the New York Portfolio promote, and the defendants' breach of their promise to restructure Fairstead Affordable to grant him a greater equity interest.

## II.    LEGAL ANALYSIS

The defendants have moved to dismiss Counts V–XI of Tatum's complaint under Court of Chancery Rule 12(b)(6). "When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

## A.    Count V: Breach Of Contract—New York Portfolio

In Count V, Tatum asserts a claim for breach of contract. He alleges that Goldberg agreed to pay him a share of the promote for the New York Portfolio as consideration for his work on the portfolio. Tatum contends that Goldberg breached that agreement by failing to pay him. Tatum has stated a claim for breach of contract.

7

### 1. The Statue of Frauds

The defendants argue that Count V is barred by the statute of frauds. The parties agree that New York law governs this issue.

New York's statute of frauds invalidates any "agreement, promise or undertaking" not in writing "if such agreement, promise or undertaking [b]y its terms is not to be performed within one year from the making thereof." N.Y. G.O.L. § 5-701(a)(1). The defendants contend that this provision invalidates the agreement to rehabilitate the New York Portfolio because it could not be completed in one year. That argument fails for two reasons. First, the work could have been completed in one year. Second, there is a writing that documents the agreement.

### a. Whether The Work Could Be Completed In One Year

The statute of frauds invalidates unwritten contracts that cannot be performed within one year. Put differently, the statute of frauds applies when "'by its terms' the agreement is not to be performed within a year." *Freedman v. Chemical Const. Corp.*, 401 N.Y.S.2d 176, 180 (1977). "[W]here performance is possible, however unlikely or improbable that may be, within one year, the agreement does not come within the proscription of the statute." *Pace v. Perk*, 440 N.Y.S.2d 710, 718 (1981).

The agreement regarding the New York Portfolio was not a multi-year contract that could not be performed in one year by its terms. The agreement theoretically could have been completed in one year. The New York Portfolio was in trouble because various units had failed to pass their housing inspections. Goldberg asked Tatum to rehabilitate the properties. If Tatum had been given enough resources, he could have completed all of the work within one year. The agreement thus was not,

8

by its terms, impossible to perform within a year. Nor did its terms call for it to be performed across multiple years.

It may have been unlikely or improbable that Tatum could have completed the rehabilitation within one year. No one imposed a one-year deadline or told him to get it done at all costs. But performance within one year was not impossible. The contract therefore does not fall within this aspect of the statute of frauds.

### b. The Presence Of A Writing

The oral agreement also does not fall within the statute of frauds because a writing sufficiently memorializes it. New York law does not require a formal contract to defeat a statute of frauds defense. Written evidence of a contract satisfies the statute of frauds "so long as such evidence provides a reasonable basis for concluding that a contract was made." N.Y. G.O.L. § 5-701(3)(d). "An e-mail sent by a party, under which the sending party's name is typed, can constitute a writing for purposes of the statute of frauds." *Newmark & Co. Real Est. Inc. v. 2615 E. 17 St. Realty LLC*, 914 N.Y.S.2d 162, 164 (2011). The evidence need not be a single document; a party can rely on multiple documents that are "pieced together to defeat the Statute of Frauds." *Manela v. Barkow*, 2012 WL 10007038, at *4 (N.Y. Sup. Ct. July 10, 2012). In *Manela*, the court found that a spreadsheet with commission percentages was sufficient in combination with emails. *See id.* at *3.

Tatum cites the spreadsheet that shows the breakdown of payments from the New York Portfolio promote and the parties that would receive them. Tatum alleges that Goldberg frequently referenced the spreadsheet as evidencing an agreement on the payment of the promote. That is sufficient at the pleading stage.

9

## 2. Lack of Consideration

The defendants next argue that Tatum could not have provided any valid consideration in exchange for the share of the New York Portfolio promote because he had a pre-existing duty under the Employment Agreement to work on the New York Portfolio. That is a possible reading of the Employment Agreement, but not the only one. The defendants are therefore not entitled to dismissal on this ground.

"A valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other." *Hamer v. Sidway*, 124 N.Y. 538, 545 (1891). "The slightest consideration is sufficient to support the most onerous obligation . . . . Forbearance is valuable consideration supporting the enforcement of an obligation." *Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 517–18 (2021).

"A promise to perform an existing legal obligation is not valid consideration to form the basis for a contract." *Nam Tai Elecs., Inc. v. UBS PaineWebber Inc.*, 850 N.Y.S.2d 11, 13 (2007). Yet,

> [p]erformance rendered by an at-will employee, before any notice of revocation, creates a unilateral contract binding the employer to pay the specified wage and to perform all other promises that he may have made in the agreement. Thus, the continued service by an employee is sufficient consideration to support an employer's promise to pay an at-will employee a bonus.

*Kaplan v. Aspen Knolls Corp.*, 290 F. Supp. 2d 335, 338 (E.D.N.Y. 2003) (internal citations omitted).

The Employment Agreement describes Tatum's duties as follows:

10

> You are being employed as a real estate director responsible for directing the acquisition and execution activities of Fairstead Affordable and to provide all other work and services assigned to you, including, but not limited to services for the Firm, its direct or indirect, principals, affiliates, parent or subsidiary entities, and any and all company or companies owned by or related to the Firm or its direct or indirect principals.

Ex. 4 § 1(A). The Employment Agreement also contemplates that Tatum can receive additional compensation in the form of an annual bonus "for services [] perform[ed] outside of [] Fairstead Affordable activities." *Id.* § 1(D). And the Employment Agreement references fees and discretionary bonuses that Tatum could receive for executing "Low Income Housing Tax Credit Deals." *Id.* § 1(F).

The defendants accept for purposes of their motion that Fairstead Affordable did not own the New York Portfolio; Feldman and Goldberg owned it outside of Fairstead Affordable. The defendants argue that the work nevertheless fell within the scope of the Employment Agreement because it constituted work "for the . . . principals" of Fairstead Affordable. They conclude that Tatum was both obligated to work on the New York Portfolio and compensated for that work under the terms of his Employment Agreement.

That is not the only possible reading of the Employment Agreement. Another possible reading is that the Employment Agreement contemplated services for Fairstead Affordable and its affiliates, but not entities or projects outside of Fairstead Affordable. Under this reading, the Employment Agreement does not cover the New York Portfolio at all.

Yet another reading is that the work on the New York Portfolio fell within the Employment Agreement, but that the Employment Agreement envisioned that

11

Tatum would receive additional compensation for that work. The Employment Agreement refers expressly to Tatum receiving additional compensation for services performed "outside of Fairstead Affordable activities." The New York Portfolio would fall under that heading.

Supporting that inference, Tatum argues that no one ever acted as if the Employment Agreement governed his work on the New York Portfolio. He did not receive the 7.5% developer fee contemplated by Section 1(F) of the Employment Agreement. He instead was promised a 5.25% interest in the promote.

At the pleading stage, it is not possible to decide among these readings. The defendants' proffered reading is not the only one, so the motion to dismiss Count V is denied.

## B. Count VI: Promissory Estoppel—New York Portfolio

In Count VI, Tatum asserts a claim for promissory estoppel based on Goldberg's promise to pay him a share of the promote for the New York Portfolio. Count VI thus asserts a quasi-contract claim based on the same facts underlying Count V. The defendants identify three grounds for dismissal. None succeeds.[2]

---

[2] The defendants make another argument that can be addressed briefly. They argue that Tatum's promissory estoppel claim is barred by the statute of frauds because when an underlying contract claim is barred by the statute of frauds, promissory estoppel cannot give rise to a claim. Assuming for the sake of argument that the defendants' position was correct, the court has declined to dismiss the contract claim as barred by the statute of frauds. By its own terms, their argument misses the boat on the quasi-contract claim.

### 1. The Employment Agreement Argument

The defendants argue that the existence of the Employment Agreement prevents Tatum from asserting a claim based on promissory estoppel. That is not so.

> Although the existence of a valid and enforceable contract governing a particular subject matter generally precludes recovery in quasi contract, *where there is a bona fide dispute as to the existence of a contract or the application of a contract to the dispute at issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract.*

*Old Salem Dev. Grp., Ltd. v. Town of Fishkill*, 754 N.Y.S.2d 333, 334 (2003) (internal citations omitted) (emphasis added).

As discussed in the preceding section, one possible reading of the Employment Agreement is that it did not govern Tatum's work on the New York Portfolio. At a minimum, a genuine dispute exists about whether the Employment Agreement governs. The existence of that agreement therefore does not provide a basis for dismissing the promissory estoppel claim.

### 2. Whether Tatum Has Pled Legal Detriment

The defendants next argue that Tatum failed to plead legal detriment. The defendants again reference the Employment Agreement and argue that Tatum received compensation under its terms. That argument again fails because a genuine dispute exists about whether the Employment Agreement covers the New York Portfolio. It also fails because Tatum has pled legal detriment.

"In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cacchillo v. Insmed, Inc.*, 551 F. App'x 592, 594 (2d Cir. 2014).

The defendants describe the injury requirement using the language of legal detriment.

Tatum has pled that he was injured and suffered legal detriment. Tatum alleges that he received a bonus in March 2021 that did not reflect his work on the New York Portfolio. He also alleges that he did not negotiate for a higher salary or bonus in reliance on Goldberg's promise to pay him a share of the promote. Tatum also alleges that he worked on the New York Portfolio, which he never would have done absent Goldberg's promise. Tatum was an at-will employee who could have left Fairstead Affordable at any time. Instead, he remained at the company, performed his duties, and worked on the New York Portfolio. Those allegations satisfy the requirement to plead injury, even if characterized as a requirement to plead legal detriment.

### 3. The Failure To Allege Unconscionability

Finally, the defendants argue that Tatum cannot assert a claim for promissory estoppel because he has not alleged an unconscionable injury. That element is not required in this setting.

"When promissory estoppel is asserted to overcome a defense based on the Statute of Frauds, an 'unconscionable' injury is required under New York law." *Cacchillo*, 551 F. App'x at 595; *accord In re Est. of Hennel*, 58 N.Y.S.3d 271, 275–76. In other words, if the statute of frauds otherwise would apply, then a plaintiff can still assert a claim for promissory estoppel by pleading that "the circumstances are so egregious as to render it unconscionable to permit the defendant to invoke the

14

statute of frauds." *Buddman Distrib., Inc. v. Labatt Imps., Inc.*, 458 N.Y.S.2d 395, 397 (1982).

Tatum has pled claims that survive the statute of frauds. He therefore does not have to plead unconscionability.

**C.      Count VII: Unjust Enrichment—New York Portfolio**

In Count VII, Tatum asserts a claim for unjust enrichment based on the defendants' failure to pay him his share of the New York Portfolio promote. The defendants make the same arguments based on the statute of frauds and the Employment Agreement that they advanced against the claim for promissory estoppel. The arguments fail for the same reasons.

**D.      Count VIII: Quantum Meruit—New York Portfolio**

In Count VIII, Tatum asserts a claim to recover under quantum meruit for the value of the services he provided when working on the New York Portfolio. The defendants make the same arguments based on the statute of frauds and the Employment Agreement that they advanced against the claim for promissory estoppel and unjust enrichment. The arguments fail for the same reasons.

**E.      Count IX: Promissory Estoppel—Hampstead Portfolio**

In Count IX, Tatum asserts a claim for promissory estoppel based on the Hampstead Portfolio promote. Tatum alleges that he owned a 9.096% direct interest in the Hampstead Portfolio promote. He alleges that he transferred that interest to Fairstead Affordable based on Goldberg's promise that Tatum's interest in Fairstead Affordable would increase in the anticipated restructuring. The restructuring never happened, meaning that Tatum transferred a direct 9.096% interest in the

Hampstead Portfolio promote to Fairstead Affordable in return for an indirect 5.35% interest. The defendants rely on the Employment Agreement and the need to plead legal detriment and unconscionability.[3]

The defendants reprise their argument about the Employment Agreement governing Tatum's compensation, including any payment related to the Hampstead Portfolio promote. That argument is substantially identical to the defendants' argument that the Employment Agreement governs any compensation that Tatum could receive for the New York Portfolio. It fails for the same reasons. Indeed, the argument is even weaker for the Hampstead Portfolio because the oral agreement did not involve compensating Tatum for work on that portfolio. It involved transferring his interest to Fairstead Affordable. The Employment Agreement does not govern that transaction.

The defendants also reprise their arguments that Tatum must plead legal detriment and unconscionability. He has obviously pled legal detriment. He does not need to plead unconscionability because he is not attempting to overcome the statute of frauds.

---

[3] The defendants initially argued that the Hampstead Portfolio promote was subject to the statute of frauds because the promote represented an interest in real property. That argument was frivolous. *See Davis v. Davis*, 205 N.Y.S. 710, 711 (Super. Ct. 1924); *see also Shaw v. Shaw*, 356 F. Supp. 2d 383, 387 (S.D.N.Y. 2005). At oral argument, the defendants prudently withdrew it.

**F.      Count X: Unjust Enrichment—Hampstead Portfolio**

In Count X, Tatum asserts a claim for unjust enrichment based on the transfer of his interest in the Hampstead Portfolio. The defendants seek dismissal on the theory that the Employment Agreement governs, but that argument fails yet again for the reasons this decision has already discussed.[4]

**G.      Count XI: Quantum Meruit—Hampstead Portfolio**

In Count VIII, Tatum asserts a claim to recover under quantum meruit in the event he does not otherwise recover for the transfer of the Hampstead Portfolio. The defendants again rely on the Employment Agreement, and that argument fails yet again for the same reasons.

## III.      CONCLUSION

The defendants' efforts to dismiss Counts V–XI are denied. Those claims can proceed past the pleading stage.

---

[4] Here too, the defendants initially invoked the statute of frauds on the theory that the Hampstead Portfolio involved an interest in real property. They prudently abandoned that frivolous position.